# STATE OF CONNECTICUT *v.* GREGG MADIGOSKY
## (SC 18263)

Rogers, C. J., and Norcott, Katz, Palmer and Zarella, Js.

Argued January 6—officially released March 31, 2009

*Norman A. Pattis*, with whom, on the brief, was *Kevin Smith*, for the appellant (defendant).

*Sarah Hanna*, deputy assistant state's attorney, with whom, on the brief, were *John A. Connelly*, state's attorney, and *Terence D. Mariani*, senior assistant state's attorney, for the appellee (state).

*Opinion*

KATZ, J. The defendant, Gregg Madigosky, directly appeals, pursuant to General Statutes § 51-199 (b) (3), from the trial court's judgment of conviction of murder in violation of General Statutes § 53a-54a.[1] The defendant contends that the trial court: (1) improperly instructed the jury not to consider the affirmative

[1] General Statutes § 53a-54a provides in relevant part: "(a) A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person or of a third person or causes a suicide by force, duress or deception; except that in any prosecution under this subsection, it shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be, provided nothing contained in this subsection shall constitute a defense to a prosecution for, or preclude a conviction of, manslaughter in the first degree or any other crime.

"(b) Evidence that the defendant suffered from a mental disease, mental defect or other mental abnormality is admissible, in a prosecution under subsection (a) of this section, on the question of whether the defendant acted with intent to cause the death of another person. . . ."

defenses of mental disease or defect and extreme emotional disturbance unless it first determined that the defendant had committed murder; (2) improperly admitted into evidence a statement given by the defendant's mother to the police; and (3) exhibited improper conduct toward defense counsel. We affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and Lynn Bossert, the victim, began living together in 1993. During their relationship, he was gainfully employed as a draftsman for Sikorsky Aircraft Corporation. As their relationship continued, the defendant grew suspicious about the victim's fidelity, and when she became pregnant, he questioned whether he was the father of the baby. In March, 2003, the victim gave birth to a girl, two months premature. The victim and the defendant later hired a nanny, Delores Sowa, to care for the baby while both parents worked.

On September 11, 2003, the defendant arrived home from work at approximately 5:50 p.m., took over the care of the baby and received the daily report from Sowa before she left. When the victim arrived home, she and the defendant, along with the baby, went to a previously scheduled counseling session with a family and marriage therapist, Julie M. Sowell, whom the couple had been seeing for the previous five months. The counseling session ended at 7:45 p.m.

Sometime after 9 p.m. that evening, the defendant and the victim had an altercation in their home, during which the defendant pushed the victim and then strangled her to death. In strangling the victim, the defendant used both of his hands and a dog leash. The strangulation caused extensive petechial hemorrhaging and edema, which indicated that force had been applied to the victim's neck for a prolonged length of time. The defendant stopped applying pressure to the victim's neck only after she had ceased struggling. He then

ripped a locket from the victim's neck and left her body lying on the floor in a pool of blood. Sometime thereafter, the defendant wrote what appeared to be a suicide note to his friends and family.[2]

At about 7:05 a.m. the following morning, the defendant telephoned Sowa, who was due to arrive shortly before 7:30 a.m., and told her not to come to the house because he was staying home from work that day. Sowa asked to speak with the victim, but the defendant said that she was in the shower. The defendant then put the baby in his car and drove to his parents' home. As soon as he arrived, he realized that he had forgotten the baby's diaper bag and returned to his house. There, he packed up the baby's things, including diapers, wipes, bottles and formula, and returned to his parents' home. The defendant's father met him in the driveway, where the defendant told his father that he and the victim had had a fight, that he had pushed her and that "she might be dead." When the two entered the house with the baby, the defendant's father awakened his wife and told her that the defendant had said that "[the victim] might be dead." The defendant went into the bathroom and began sobbing. The defendant's father left his house to check on the victim. After discovering the victim lying dead on the floor surrounded by blood, he telephoned the police.

While the defendant waited at his parents' home with his mother, the police surrounded the home. Major Peter Warren of the state police telephoned the house and asked to speak with the defendant. The defendant fully understood and complied with Warren's instructions to come out of the front door of the house slowly.

---

[2] The defendant's handwritten note, which subsequently was found in his right front pants pocket, provided: "Lynn, I loved you so much. But did not know what was going to happen to me. I did not know if you [were] with someone else or not, and that [our child] was even ours. Jobber Paul, Mario, Ken, or Mike. I am sorry for everyone at work, I did not mean to hurt anyone. Julie, thank you for your help. Mom and Dad I love you. Anthony be good. Frank and Rick thanks for mechanic school."

Once outside, the defendant followed additional instructions that he was given, and he was arrested without further incident.

Following his arrest, the defendant was brought to the police station where he gave a statement to state police Detectives Richard Covello and Brian Van Ness. During the interview, the defendant made several incriminating and remorseful statements. He stated that he did not deserve help because of what he had done to the victim. Then, slumped over with his head down, he began crying. Later, in response to a question regarding what in his past he regretted most, the defendant said, "taking [the victim's] life." The defendant admitted to killing the victim, and forensic examination of the victim's fingernail clippings revealed skin scrapings consistent with the defendant's DNA.

The record discloses the following additional facts. At trial, the defendant presented two affirmative defenses: that he suffered from a mental disease or defect and that he suffered from an extreme emotional disturbance. In support of those defenses, he offered the testimony of Marvin Zelman, a board certified psychiatrist. Zelman testified that, on February 24, 2003, the defendant went to the police complaining of depression and paranoia. The police brought the defendant to Waterbury Hospital for an emergency psychiatric examination, which resulted in the defendant's inpatient treatment for nine days and subsequent outpatient treatment. According to the hospital records, the defendant reported that, although he had been prescribed psychiatric medications for mental illness, he had not been taking those medications for the past year. The hospital diagnosed the defendant as having major depression, recurrent, with psychosis. While at the hospital, the defendant initially was prescribed Haldol, an antipsychotic medication, but later was prescribed Risperdal, another antipsychotic medication effective in the treatment of both

schizophrenia and bipolar disorder, and Remeron, an antidepressant. The defendant was discharged from the hospital on March 4, 2003, despite his physician's conclusion that he was, at the time of discharge, a danger to himself and to others. Although he was supposed to remain on his psychiatric medications, in the weeks after his discharge, the defendant gradually reduced and then discontinued taking his medications. In the days before the victim was killed, the defendant suffered from paranoid delusions, believing, in part, that he was being investigated at work for the crash of a helicopter designed by the company. The defendant told Zelman that he had killed the victim because he was angry at her for cheating on him with her former husband or one of his coworkers. Zelman testified that, in his opinion, on the date of the killing, the defendant was "psychotic, and [that] the nature of his illness is schizoaffective disorder, depressive type." In his opinion, the strangulation was a product or byproduct of the defendant's mental illness. Zelman explained: "[The defendant] was severely disturbed. He was psychotic, out of touch with reality, incapable of making judgments, reasonable judgments, and mentally ill at the time and this is how he responded to a provocation." In Zelman's opinion, the events between the time the defendant was discharged from the hospital and the night on which the victim was killed represented a "psychiatric perfect storm. . . . You have one of the sickest people combined with the worst treatment and that's what really happened. . . . All he needed was a stressor and multiple stressors occurred."[3] Zelman underscored that, in his view, the defendant was unable to control his conduct.

[3] The stressors that Zelman cited included: the premature birth of the defendant's child; the death of the victim's mother the same day the victim brought the baby home from the hospital; the defendant's emergency hospital admission; and the disruption to his routine with the concurrent hiring of a nanny and the victim's return to work.

The jury returned a verdict of guilty on the murder charge, and the trial court rendered judgment in accordance with the verdict. This direct appeal followed.

I

In his first claim on appeal, the defendant asserts that the trial court's instructions to the jury to consider whether the state had proven the elements of murder before considering the defendant's affirmative defenses of mental disease or defect[4] and extreme emotional disturbance; see footnote 1 of this opinion; "effectively told [the jury] to disregard evidence of insanity insofar as it might have shed light on whether the defendant acted with the necessary mens rea." The defendant contends that the instruction impaired his constitutional right to present a defense and that it diluted the state's burden of proof on the element of specific intent. The defendant acknowledges that he did not raise an objection before the trial court, and, accordingly, seeks to prevail on this unpreserved claim under either *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989),[5] or the plain error doctrine.[6]

---

[4] General Statutes § 53a-13 (a) provides: "In any prosecution for an offense, it shall be an affirmative defense that the defendant, at the time he committed the proscribed act or acts, lacked substantial capacity, as a result of mental disease or defect, either to appreciate the wrongfulness of his conduct or to control his conduct within the requirements of the law."

[5] In *Golding*, this court concluded that "a defendant can prevail on a claim of constitutional error not preserved at trial only if all of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Knybel*, 281 Conn. 707, 712–13, 916 A.2d 816 (2007). "The first two [prongs of *Golding*] involve a determination of whether the claim is reviewable; the second two . . . involve a determination of whether the defendant may prevail." (Internal quotation marks omitted.) *State* v. *Brown*, 279 Conn. 493, 500, 903 A.2d 169 (2006).

[6] "[T]he plain error doctrine, which is now codified at Practice Book § 60-5 . . . is not . . . a rule of reviewability. It is a rule of reversibility. That

The state responds that the defendant's claim fails to satisfy the second prong of *Golding* because, as this court has stated, "an instructional omission with respect to an affirmative defense such as legal insanity does not rise to the level of a constitutional violation."[7] *State* v. *Wilson*, 242 Conn. 605, 632, 700 A.2d 633 (1997);

is, it is a doctrine that this court invokes in order to rectify a trial court ruling that, although either not properly preserved or never raised at all in the trial court, nonetheless requires reversal of the trial court's judgment, for reasons of policy. . . . In addition, the plain error doctrine is reserved for truly extraordinary situations where the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . Plain error is a doctrine that should be invoked sparingly. . . . A party cannot prevail under plain error unless it has demonstrated that the failure to grant relief will result in manifest injustice. . . . Implicit in this very demanding standard is the notion, explained previously, that invocation of the plain error doctrine is reserved for occasions requiring the reversal of the judgment under review." (Internal quotation marks omitted.) *State* v. *Simpson*, 286 Conn. 634, 647–48 n.16, 945 A.2d 449 (2008).

[7] The state also asserts that the defendant is not entitled to *Golding* review because he induced the trial court's conduct by essentially acquiescing to the court's instruction without objecting to it. See *State* v. *Cruz*, 269 Conn. 97, 105–107, 105 n.7, 848 A.2d 445 (2004) (induced error not reviewable under *Golding*). We disagree. "[T]he term induced error, or invited error, has been defined as [a]n error that a party cannot complain of on appeal because the party, through conduct, encouraged or prompted the trial court to make the erroneous ruling. . . . It is well established that a party who induces an error cannot be heard to later complain about that error. . . . This principle bars appellate review of induced nonconstitutional error and induced constitutional error. . . . There was no induced instructional error in this case because the defendant had not submitted a request to charge or suggested any instructional language. Cf. [id.], 106 (instructional error induced when defendant affirmatively requested challenged language in request to charge); *State* v. *Scognamiglio*, 202 Conn. 18, 25, 519 A.2d 607 (1987) (It seems a bit disingenuous for the defendant to claim the trial court committed error by instructing the jury on flight when he requested an instruction on that very issue. At least, where no constitutional rights are violated, when an accused requests in writing that an issue be submitted to the jury, he cannot, on appeal, claim error in its submission.); *State* v. *Hinckley*, 198 Conn. 77, 80–81 and n.2, 502 A.2d 388 (1985) (defendant induced instructional error by requesting that trial court include superseded common law tests in charge)." (Citation omitted; internal quotation marks omitted.) *State* v. *Griggs*, 288 Conn. 116, 126–27 n.13, 951 A.2d 531 (2008).

accord *State* v. *Foreshaw*, 214 Conn. 540, 546, 572 A.2d 1006 (1990); *State* v. *Suggs*, 209 Conn. 733, 751, 553 A.2d 1110 (1989); *State* v. *Preyer*, 198 Conn. 190, 196–97, 502 A.2d 858 (1985). Should this court reach the merits of the defendant's claim, the state maintains that: the instruction was correct; the defendant "conflates the analytic distinction [that exists] between mental status as it relates to the insanity defense and mental status as it relates to intent to engage in criminal conduct"; (internal quotation marks omitted) *Sastrom* v. *Mullaney*, 286 Conn. 655, 664, 945 A.2d 442 (2008); and, because the trial court told the jury to consider all the facts and circumstances surrounding the killing in deciding the issue of intent, the instructions did not prohibit the jury from considering the defendant's mental condition, which predominated the trial, as one of those circumstances. We conclude that, under the circumstances of the present case, the defendant cannot satisfy the second prong of *Golding* or the plain error doctrine, and we decline to review this claim.

The record discloses the following additional pertinent facts. In its preliminary instructions prior to the commencement of evidence, the trial court gave the jury an overview of both the charged crime of murder and the affirmative defenses of mental disease or defect and extreme emotional disturbance. In instructing on murder, the court read the statutory offense and explained the elements, including specific intent. In its subsequent instructions on the affirmative defense of mental disease or defect, the court read the relevant statute; see footnote 4 of this opinion; and explained that the jury would not consider this defense if it did not find that the state had proven the charge of murder. The trial court then turned to the affirmative defense of extreme emotional disturbance, gave a brief overview of the defense, read the relevant statute; see footnote 1 of this opinion; and explained that its

consideration of this defense would depend on its findings. In so instructing, the court remarked to the jury that, "[o]bviously, in this particular case, the mental state of the defendant at the time of these acts that are charged by the state is crucial."

To aid the jury in its final deliberations, in accordance with *numerous* discussions the trial court had had with the parties at the close of evidence and the copy of the proposed instructions the court had given counsel during its charging conference; see Practice Book § 42-19; the trial court then provided a flow chart to the jury. That chart directed the jury first to consider the charge of murder and to consider the affirmative defenses, first mental disease or defect and then extreme emotional disturbance, only if the jury concluded that the state had proved all of the elements of murder beyond a reasonable doubt. Consistent with the sequence in the flow chart, the court first instructed the jury on the crime of murder and the specific intent element of that crime. The court then instructed on the affirmative defense of mental disease or defect, followed by the defense of extreme emotional disturbance. Within its charge, the court specifically instructed the jury to follow its flow chart and to consider first whether the state had proven its charge and then to consider the defendant's affirmative defenses. Additionally, the court outlined the four possible verdicts.

At the conclusion of the court's instructions, the court provided the jury with a verdict form that reflected the opposite sequence. The form required the jury first to consider whether the defendant suffered from a mental disease or defect. If the jury concluded that the defendant did not so suffer, it was then to consider whether the defendant had acted under extreme emotional disturbance. Only if the jury answered these two questions in the negative did the jury reach the question of

whether the defendant had committed the crime of murder. After a three day weekend break and prior to deliberations, however, the court briefly reviewed its charge to the jury, including the order in which the jury was to consider the issues in reaching those verdicts consistent with the flow chart.

As the defendant concedes, he never objected to the sequence of the instructions, the flow chart, the explanation of the possible verdicts or anything else related to the specific intent or affirmative defense instructions. We conclude that under the circumstances of the present case, the defendant cannot satisfy *Golding* or the plain error doctrine.

Although it is well settled that an instructional impropriety with respect to an affirmative defense such as legal insanity does not rise to the level of a constitutional violation; see *State* v. *Wilson*, supra, 242 Conn. 632; we understand the defendant's claim more broadly. He recognizes that the court gave an otherwise proper instruction on his affirmative defenses and that it is generally the duty of the court to structure the jurors' deliberations in a manner that permits them to perform in an orderly fashion their fact-finding function in relation to the charged crime and any defenses. He further appreciates that there is a distinction under our case law between mental status as it relates to the insanity defense and mental status as it relates to intent to engage in criminal conduct. He suggests, nevertheless, that we should reexamine that concept, contending that the jury likely was confused by the sequence in which the court directed it to consider the evidence so that it did not consider mental status evidence relevant to the affirmative defenses when considering the intent element of the crime. We conclude that, even if we were inclined to agree that our law in this area should be reconsidered, the present case is not an appropriate one in which to do so.

We begin with a very brief overview of the affirmative defenses at issue. The affirmative defense of mental disease or defect, otherwise known as the insanity defense, is codified in General Statutes § 53a-13. See footnote 4 of this opinion. This defense has both a cognitive and a volitional prong. *State* v. *Wilson*, supra, 242 Conn. 613. "Under the cognitive prong [of the insanity defense], a person is considered legally insane if, as a result of mental disease or defect, he lacks substantial capacity . . . to appreciate the . . . [wrongfulness] of his conduct. . . . Under the volitional prong, a person also would be considered legally insane if he lacks substantial capacity . . . to conform his conduct to the requirements of law." (Citation omitted; internal quotation marks omitted.) Id.

Extreme emotional disturbance, an affirmative defense that reduces the crime of murder to manslaughter, is codified in § 53a-54a (a), which provides in relevant part: "[I]t shall be an affirmative defense that the defendant committed the proscribed act or acts under the influence of extreme emotional disturbance for which there was a reasonable explanation or excuse, the reasonableness of which is to be determined from the viewpoint of a person in the defendant's situation under the circumstances as the defendant believed them to be . . . ." See footnote 1 of this opinion. This court offered the following guidance on the application of this defense in *State* v. *Zdanis*, 182 Conn. 388, 390–91, 438 A.2d 696 (1980), cert. denied, 450 U.S. 1003, 101 S. Ct. 1715, 68 L. Ed. 2d 607 (1981): "In determining whether the defendant has established the affirmative defense of an extreme emotional disturbance by a fair preponderance of the evidence as a mitigation of murder to manslaughter, the trier of fact must find that: (a) *the emotional disturbance is not a mental disease or defect that rises to the level of insanity as defined by the penal code*; (b) the defendant was exposed to an

extremely unusual and overwhelming state, that is, not mere annoyance or unhappiness; and (c) the defendant had an extreme emotional reaction to it, as a result of which there was a loss of self-control, and reason was overborne by extreme intense feelings, such as passion, anger, distress, grief, excessive agitation or other similar emotions. Consideration is given to whether the intensity of these feelings was such that his usual intellectual controls failed and the normal rational thinking for that individual no longer prevailed at the time of the act." (Emphasis added.)

We previously have recognized that there is a "risk that a jury may have difficulty in understanding the distinction between mental status as it relates to the defense of insanity and mental status as it relates to intent." *State* v. *Joyner*, 225 Conn. 450, 461 n.5, 625 A.2d 791 (1993). That difficulty in part stems from the conclusion reached by the United States Supreme Court in *Patterson* v. *New York*, 432 U.S. 197, 205–207, 97 S. Ct. 2319, 53 L. Ed. 2d 281 (1977), that sanity is not an element of the crime in a criminal prosecution. Although we have suggested that "[w]hatever risk of confusion may be engendered by this distinction must be addressed by an appropriate jury instruction"; *State* v. *Joyner*, supra, 461 n.5; as with any jury instruction claim, we must examine the issue or issues before the jury, including what was undisputed, and examine the charge "in view of the factual posture of the case." *State* v. *Kurvin*, 186 Conn. 555, 569, 442 A.2d 1327 (1982).

In the present case, as his brief to this court elucidates, the defendant relied on the volitional prong of § 53a-13. The psychiatric evidence portrayed him as a severely disturbed psychotic who lacked substantial capacity to conform his conduct to societal standards. In essence, there was no assertion that the defendant did not fully intend to strangle the victim until she was dead, only that he could not stop himself. On the basis

of that theory, however, a finding of intent to kill would not have undermined the jury's ability to consider and indeed believe the evidence offered in support of the defendant's theory of his affirmative defense under § 53a-13. Additionally, the jury reasonably could have found that the defendant specifically had intended to kill the victim, but that the defendant's extreme emotional disturbance resulted in a loss of self-control. Thus, the defendant's affirmative defenses in no way challenged the intent element of the crime. Indeed, the defendant's repeated failures to object to the sequence that the trial court directed the jury to follow in its deliberations, despite direct inquiries from the trial court,[8] as well the defendant's express adoption of this sequence in his closing argument[9] indicate that the defendant's theory of the case at trial was not the one that he advances on appeal. The evidence offered in support of the affirmative defenses advanced at trial simply was not relevant to his specific intent to kill.

There may be a case in which a defendant's insanity defense evidence actually challenges the intent element of the crime, one in which the defendant's mental state

[8] Following the court's initial explanation of the flow chart to the parties, the defendant initially expressly stated that he agreed with the chart. He then began to propose an alternative way for the jury to consider these issues but abandoned that proposal, agreeing to the trial court's proposal. The defendant does not claim on appeal that this abandoned proposal preserved his claim. At the charging conference, the trial court gave both counsel a copy of its proposed instructions. The court discussed the murder charge and inquired whether there was "[a]ny objection to the flow chart," to which the defendant responded, "[n]o, Your Honor." The defendant also did not object to any other portion of the materials prepared for the jury, including the instructions on murder and intent.

[9] In its closing argument, defense counsel asked the jury to "assume your decision process is like a flow chart. . . . [T]he question that you must decide is whether all the elements of the crime charged, namely murder, have been proven. . . . But you don't stop there, you must go on to my defenses." Additionally, defense counsel explained that "[t]he flow chart is of great use to you in understanding these steps and I think it should be something you should consider in your deliberations."

is such that he intends to engage in the conduct for which he is charged, but, because of a mental disease or defect or his extreme emotional state, does not act with the specific intent required for the charged offense. By way of example, if an accused intentionally engaged in conduct—the stabbing of a person—but, because of his mental state, thought he was stabbing a piece of meat, the jury's function to assess whether the state had proved the elements of the crime beyond a reasonable doubt would require it to consider his affirmative defense evidence in concert with its assessment of his intent. In other words, the affirmative defenses in that case would intersect with an essential element of the offense. That situation, however, is not at issue in the present case, as no evidence had been introduced at trial reflective of that scenario. Thus, irrespective of the order in which the jury was directed to consider the affirmative defenses, that sequence did not either dilute the state's burden of proof on the element of intent for the crime charged or undermine the defendant's ability to present evidence relevant to that element. Accordingly, although the defendant struggles mightily to invoke *Golding* review and the plain error doctrine, he cannot prevail under either.

## II

In his second claim on appeal, the defendant asserts that the trial court improperly admitted a statement by his mother in which she states that he essentially admitted the crime to her. The defendant claims that the statement was introduced in violation of his confrontation rights under the sixth amendment to the United States constitution. The state agrees that the trial court violated those rights but contends that the impropriety was harmless beyond a reasonable doubt. We agree with the state.

The record discloses the following additional undisputed facts. The state subpoenaed the defendant's

mother, Joan Madigosky, to testify. When she failed to appear due to illness, the state offered her statement to police detective David Edwards "based on her purported inability to be here and the residual exception to the hearsay rule." The defendant objected, claiming that the statement violated his confrontation rights, but the trial court overruled his objection. Thereafter, the state introduced into evidence Joan Madigosky's statement, in which she described the events that had unfolded at her home the morning after the murder and recounted the defendant's statements admitting that he had pushed the victim and that he was sure she was dead.[10]

---

[10] The following statement was read into evidence: "This morning at about [7:25 a.m.] my husband . . . woke me up. He told me something terrible has happened and that I needed to get up quick. I think I remember him telling me, '[the victim] is dead.' I went into the kitchen and I had to take my breathing machine. My son [the defendant] was in the kitchen and his baby . . . was in her seat in the living room. It took me about [fifteen] minutes to use my machine and [the defendant] was holding my hand. I had to take my machine before I could talk. After I took my machine I went into the living room with [the defendant]. My husband had left while I was taking my machine to check on [the victim] to see if she was [okay]. When I was in the living room with [the defendant] we hugged each other. I told him, 'you're a good person.' He said, 'no, I'm not.' I told him, 'yes, you are!' I told him to look at his [child]. He said he couldn't look . . . . I told him, 'you look at her! You're [the] father!' And he did. Then he changed [the baby's] diaper. I asked him what happened, and he said, 'I pushed her in the hallway.' And I said, 'well, gee, maybe she's [okay]. Maybe she's not dead.' And he said, 'No. She's dead!' Then my neighbor . . . called me up and she said the police are all over the place. I told [the defendant]. He didn't say anything. Then someone from the police called and they said they wanted to talk to [the defendant]. [He] went outside and then the police yelled at him. Before [he] went outside, while he was telling me he pushed [the victim], he said that the night before he was with his therapist and his therapist could tell he didn't take his medication, so he took his medication last night. The whole time [the defendant] was at my house this morning he was acting very solemn, and he was crying while he was in the bathroom. My husband said, 'let it out.' [The defendant] kept saying he loved her. He told me to take care of his [child]. [He] has never been violent. [He] never told me why he pushed [the victim]."

"Under *Crawford* v. *Washington*, [541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004)], the hearsay[11] statements of an unavailable witness that are testimonial in nature may be admitted under the sixth amendment's confrontation clause only if the defendant has had a prior opportunity to cross-examine the declarant. Hearsay statements that are nontestimonial in nature are not governed by the confrontation clause, and their admissibility is governed solely by the rules of evidence. *Davis* v. *Washington*, 547 U.S. 813, [823–24, 126 S. Ct. 2266], 165 L. Ed. 2d 224 (2006). Thus, the threshold inquiry for purposes of the admissibility of such statements under the confrontation clause is whether they are testimonial in nature. Because this determination is a question of law, our review is plenary. *State* v. *Kirby*, 280 Conn. 361, 378, 908 A.2d 506 (2006).

"In *Crawford*, the Supreme Court declined to spell out a comprehensive definition of testimonial . . . . Instead, the court defined a testimonial statement in general terms: A solemn declaration or affirmation made for the purpose of establishing or proving some fact. . . . The court did note, however, three formulations of th[e] core class of testimonial statements . . . [1] ex parte in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . . [2] extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . [and 3] statements that were made under circumstances which would lead an objective witness reason-

---

[11] There is no dispute that all the statements at issue in the present case constituted hearsay—i.e., they were out-of-court statements offered for the truth of the matter asserted. See *State* v. *Wargo*, 255 Conn. 113, 127, 763 A.2d 1 (2000).

ably to believe that the statement would be available for use at a later trial . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Slater*, 285 Conn. 162, 169–70, 939 A.2d 1105, cert. denied, 553 U.S. 1085, 128 S. Ct. 2885, 171 L. Ed. 2d 822 (2008).

In the present case, the state concedes that introduction of the statement violated the defendant's confrontation rights because it was testimonial, as a consequence of police interrogation, and the defendant had not had an opportunity to cross-examine the declarant. We agree. Therefore, the only issue is whether the state can sustain its burden of proof that the error was harmless beyond a reasonable doubt. *State* v. *Randolph*, 284 Conn. 328, 377, 933 A.2d 1158 (2007) ("[i]f an [evidentiary] impropriety is of constitutional proportions, the state bears the burden of proving that the error was harmless beyond a reasonable doubt" [internal quotation marks omitted]).

"Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) *State* v. *Carpenter*, 275 Conn. 785, 832, 882 A.2d 604 (2005), cert. denied, 547 U.S. 1025, 126 S. Ct. 1578, 164 L. Ed. 2d 309 (2006). "Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citations omitted; internal quotation marks omitted.) *State* v. *Colton*, 227

Conn. 231, 254, 630 A.2d 577 (1993), on appeal after remand, 234 Conn. 683, 663 A.2d 339 (1995), cert. denied, 516 U.S. 1140, 116 S. Ct. 972, 133 L. Ed. 2d 892 (1996). In order to assess the harmfulness of the impropriety, "we review the record to determine whether there is a reasonable possibility that the evidence . . . complained of might have contributed to the conviction . . . ." (Internal quotation marks omitted.) *State* v. *Gerardi*, 237 Conn. 348, 362, 677 A.2d 937 (1996).

Although the state did not state expressly the purpose for which it offered the statement, the state's closing argument indicates that its purpose was to demonstrate the defendant's remorse following the killing, which the state argued was relevant to the defendant's knowledge of the wrongfulness of his conduct. Indeed, the defendant agrees that the statement "showed [him] reacting in a sober, guilt-ridden manner in the wake of the victim's death . . . ." There was, however, ample evidence of the defendant's remorse that properly was admitted, thereby making his mother's statement cumulative. The note the defendant wrote to his family and friends after he strangled the victim; see footnote 2 of this opinion; demonstrated remorse at a time even closer to the act. Additionally, testimony about the defendant's remorse from his father related to the same events and time period in his mother's statement. Finally, testimony also established that the defendant had demonstrated remorse when he broke down crying in his interview at the police station and when he told the police how much he regretted what he had done and that he did not deserve help because of what he had done to the victim. Therefore, the statement of the defendant's mother was cumulative in that it was only one of several pieces of evidence that the jury heard demonstrating that the defendant had "react[ed] in a sober, guilt-ridden manner in the wake of the victim's

death . . . ." See *State* v. *Kelly*, 256 Conn. 23, 39–40, 770 A.2d 908 (2001) ("corroborative testimony was merely cumulative and was therefore harmless" [internal quotation marks omitted]); *State* v. *Milner*, 206 Conn. 512, 529, 539 A.2d 80 (1988) (one factor to be considered in determining whether improper ruling on evidence is harmless error is "whether the testimony was cumulative").

Furthermore, there was ample other evidence corroborating the defendant's controlled behavior following the strangulation of the victim, which the jury evidently relied on to reject the defendant's affirmative defenses: the note the defendant wrote after strangling the victim, which clearly reflected his knowledge of what he had done; his telephone call to Sowa to cancel her services and his excuse for why the victim could not come to the telephone; and his gathering and organizing his child's things before driving her to his parents. Against this backdrop, we conclude that the introduction of the statement by the defendant's mother was harmless beyond a reasonable doubt.

## III

Lastly, the defendant claims that comments by the trial court constituted judicial impropriety that deprived him of a fair trial. Specifically, the defendant contends that "[t]he record . . . reveals numerous instances of the trial court interceding, both in and out of the jury's presence, in the merits of trial to interrupt and rebuke defense counsel," which the defendant claims demonstrated the court's animus. Although several pages of his brief to this court are devoted to legal argument in the abstract, wherein the defendant recites our jurisprudence regarding the importance of a judge's neutrality and the need to avoid the appearance of partisanship; *State* v. *Woodson*, 227 Conn. 1, 30, 629 A.2d 386 (1993); *State* v. *Gionfriddo*, 154 Conn. 90, 96, 221 A.2d 851

(1966); with three exceptions, he fails to identify what specific transgressions the trial court committed. *Smith* v. *Andrews*, 289 Conn. 61, 80, 959 A.2d 597 (2008) (numerous pages of abstract argument does not render claim adequately briefed). Otherwise, the defendant has offered blanket citations to various pages or sequences of pages of the transcript. Of the three instances that the defendant cites, none rises even remotely to the level of judicial impropriety.[12] Consequently, lacking citation to the specific language complained about in connection with the appropriate legal analysis, this claim is inadequately briefed. See *State* v. *Brown*, 256 Conn. 291, 312–13, 772 A.2d 1107 ("The defendant's argument regarding this subject is inadequately briefed. Although the standard for prosecutorial misconduct in this regard is set forth, the defendant fails to cite specific language as examples of his claims that the state improperly commented on the defendant's failure to testify or that the defendant was misusing his pro se status."), cert. denied, 534 U.S. 1068, 122 S. Ct. 670, 151 L. Ed. 2d 584 (2001); *State* v. *Prioleau*, 235 Conn. 274, 294–95, 664 A.2d 743 (1995) ("The defendant has furnished us with no legal analysis of what particular language in the trial court's instruction 'combined aspects' [of two statutory sections], or why this alleged combination was improper. Moreover, the defendant has provided no case citations or other authority in support of

---

[12] All three instances of alleged impropriety by the trial court occurred outside the presence of the jury. In the first instance identified by the defendant, the trial court asked defense counsel whether he understood English in connection with the admission of the medical examiner's autopsy report pursuant to General Statutes § 19a-412. The court later warned defense counsel not to "play games" with the court when he started to converse with the state's attorney during legal argument. In the third instance, the trial court told defense counsel, during the course of his cross-examination of Sowell about the effect the adjudication in the present case might have on the civil action filed by the victim's estate against Sowell, that defense counsel was "creating a false impression" and that he "misstated the test that [was] going to be put to the jury."

his argument. We therefore refuse to review his claim."). Accordingly, we decline to reach this issue.

The judgment is affirmed.

In this opinion the other justices concurred.