******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

GREGG MADIGOSKY *v.* COMMISSIONER OF
CORRECTION
(AC 38962)

Beach, Mullins and Bear, Js.*

*Argued November 29, 2016—officially released April 11, 2017*

(Appeal from Superior Court, judicial district of
Tolland, Cobb, J.)

*Norman A. Pattis*, with whom, on the brief, was
*Brittany B. Paz*, for the appellant (petitioner).

*Sarah Hanna*, assistant state's attorney, with whom,
on the brief, were *Maureen Platt*, state's attorney, and
*Jo Anne Sulik*, supervisory assistant state's attorney,
for the appellee (respondent).

*Opinion*

BEACH, J. The petitioner, Gregg Madigosky, appeals from the judgment of the habeas court denying his petition for a writ of habeas corpus. The petitioner claims that the court erred in concluding that he failed to prove ineffective assistance of counsel by not adequately preparing an expert witness. We affirm the judgment of the habeas court.

The following facts regarding the underlying criminal conviction were set forth by our Supreme Court on direct appeal. "The [petitioner] and Lynn Bossert, the victim, began living together in 1993. During their relationship, he was gainfully employed as a draftsman for Sikorsky Aircraft Corporation. As their relationship continued, the [petitioner] grew suspicious about the victim's fidelity, and when she became pregnant, he questioned whether he was the father of the baby. In March, 2003, the victim gave birth to a girl, two months premature. The victim and the [petitioner] later hired a nanny, Delores Sowa, to care for the baby while both parents worked.

"On September 11, 2003, the [petitioner] arrived home from work at approximately 5:50 p.m., took over the care of the baby and received the daily report from Sowa before she left. When the victim arrived home, she and the [petitioner], along with the baby, went to a previously scheduled counseling session with a family and marriage therapist, Julie M. Sowell, whom the couple had been seeing for the previous five months. The counseling session ended at 7:45 p.m.

"Sometime after 9 p.m. that evening, the [petitioner] and the victim had an altercation in their home, during which the [petitioner] pushed the victim and then strangled her to death. In strangling the victim, the [petitioner] used both of his hands and a dog leash. The strangulation caused extensive petechial hemorrhaging and edema, which indicated that force had been applied to the victim's neck for a prolonged length of time. The [petitioner] stopped applying pressure to the victim's neck only after she had ceased struggling. He then ripped a locket from the victim's neck and left her body lying on the floor in a pool of blood. Sometime thereafter, the [petitioner] wrote what appeared to be a suicide note to his friends and family.

"At about 7:05 a.m. the following morning, the [petitioner] telephoned Sowa, who was due to arrive shortly before 7:30 a.m., and told her not to come to the house because he was staying home from work that day. Sowa asked to speak with the victim, but the [petitioner] said that she was in the shower. The [petitioner] then put the baby in his car and drove to his parents' home. As soon as he arrived, he realized that he had forgotten the baby's diaper bag and returned to his house. There, he packed up the baby's things, including diapers,

wipes, bottles and formula, and returned to his parents' home. The [petitioner's] father met him in the driveway, where the [petitioner] told his father that he and the victim had had a fight, that he had pushed her and that 'she might be dead.' When the two entered the house with the baby, the [petitioner's] father awakened his wife and told her that the [petitioner] had said that '[the victim] might be dead.' The [petitioner] went into the bathroom and began sobbing. The [petitioner's] father left his house to check on the victim. After discovering the victim lying dead on the floor surrounded by blood, he telephoned the police.

"While the [petitioner] waited at his parents' home with his mother, the police surrounded the home. Major Peter Warren of the state police telephoned the house and asked to speak with the [petitioner]. The [petitioner] fully understood and complied with Warren's instructions to come out of the front door of the house slowly. Once outside, the [petitioner] followed additional instructions that he was given, and he was arrested without further incident.

"Following his arrest, the [petitioner] was brought to the police station where he gave a statement to state police Detectives Richard Covello and Brian Van Ness. During the interview, the [petitioner] made several incriminating and remorseful statements. He stated that he did not deserve help because of what he had done to the victim. Then, slumped over with his head down, he began crying. Later, in response to a question regarding what in his past he regretted most, the [petitioner] said, 'taking [the victim's] life.' The [petitioner] admitted to killing the victim, and forensic examination of the victim's fingernail clippings revealed skin scrapings consistent with the [petitioner's] DNA. . . .

"At trial, the [petitioner] presented two affirmative defenses: that he suffered from a mental disease or defect and that he suffered from an extreme emotional disturbance. In support of those defenses, he offered the testimony of Marvin Zelman, a board certified psychiatrist. Zelman testified that, on February 24, 2003, the [petitioner] went to the police complaining of depression and paranoia. The police brought the [petitioner] to Waterbury Hospital for an emergency psychiatric examination, which resulted in the [petitioner's] inpatient treatment for nine days and subsequent outpatient treatment. According to the hospital records, the [petitioner] reported that, although he had been prescribed psychiatric medications for mental illness, he had not been taking those medications for the past year. The hospital diagnosed the [petitioner] as having major depression, recurrent, with psychosis. While at the hospital, the [petitioner] initially was prescribed Haldol, an antipsychotic medication, but later was prescribed Risperdal, another antipsychotic medication effective in the treatment of both schizophrenia and bipolar dis-

order, and Remeron, an antidepressant. The [petitioner] was discharged from the hospital on March 4, 2003, despite his physician's conclusion that he was, at the time of discharge, a danger to himself and to others. Although he was supposed to remain on his psychiatric medications, in the weeks after his discharge, the [petitioner] gradually reduced and then discontinued taking his medications. In the days before the victim was killed, the [petitioner] suffered from paranoid delusions, believing, in part, that he was being investigated at work for the crash of a helicopter designed by the company. The [petitioner] told Zelman that he had killed the victim because he was angry at her for cheating on him with her former husband or one of his coworkers. Zelman testified that, in his opinion, on the date of the killing, the [petitioner] was 'psychotic, and [that] the nature of his illness is schizoaffective disorder, depressive type.' In his opinion, the strangulation was a product or byproduct of the [petitioner's] mental illness. Zelman explained: '[The [petitioner]] was severely disturbed. He was psychotic, out of touch with reality, incapable of making judgments, reasonable judgments, and mentally ill at the time and this is how he responded to a provocation.' In Zelman's opinion, the events between the time the [petitioner] was discharged from the hospital and the night on which the victim was killed represented a 'psychiatric perfect storm. . . . You have one of the sickest people combined with the worst treatment and that's what really happened. . . . All he needed was a stressor and multiple stressors occurred.' Zelman underscored that, in his view, the [petitioner] was unable to control his conduct." (Footnotes omitted.) *State* v. *Madigosky*, 291 Conn. 28, 30–33, 966 A.2d 730 (2009). The petitioner was convicted of murder in violation of General Statutes § 53a-54a and sentenced to fifty years incarceration. His conviction was affirmed by our Supreme Court on direct appeal. Id., 49.

The petitioner filed the operative petition for a writ of habeas corpus in July, 2013. The petitioner alleged that his trial counsel, Ralph Crozier, rendered ineffective assistance because he failed to adequately prepare Zelman, the petitioner's expert witness, "to address the distinction between the two types of diminished capacity defenses[1] so that he could adequately address both cognitive and volitional arguments." (Emphasis omitted; footnote added.) Following a trial, the court concluded that the petitioner had failed to prove both deficient performance and prejudice. The court granted the petitioner's petition for certification to appeal from the denial of the habeas petition. This appeal followed.

We begin with the applicable standard of review. "In a habeas appeal, this court cannot disturb the underlying facts found by the habeas court unless they are clearly erroneous, but our review of whether the facts as found by the habeas court constituted a violation of the petitioner's constitutional right to effective assistance of

counsel is plenary. . . . As enunciated in *Strickland* v. *Washington*, [466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)] . . . [a] claim of ineffective assistance of counsel consists of two components: a performance prong and a prejudice prong. To satisfy the performance prong . . . the petitioner must demonstrate that his attorney's representation was not reasonably competent or within the range of competence displayed by lawyers with ordinary training and skill in the criminal law. . . . To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A court can find against a petitioner, with respect to a claim of ineffective assistance of counsel, on either the performance prong or the prejudice prong . . . ." (Internal quotation marks omitted.) *Browne* v. *Commissioner of Correction*, 158 Conn. App. 1, 7–8, 125 A.3d 1014, cert. denied, 318 Conn. 906, 122 A.3d 634 (2015).

The petitioner argues that the court erred in determining that he failed to satisfy both the performance and the prejudice prongs of the *Strickland* test. We conclude that an examination of the prejudice prong alone is sufficient to determine that the court properly denied the petitioner's petition. See *Nieves* v. *Commissioner of Correction*, 51 Conn. App. 615, 620, 724 A.2d 508 ("[a] court need not determine the deficiency of counsel's performance if consideration of the prejudice prong will be dispositive of the ineffectiveness claim"), cert. denied, 248 Conn. 905, 731 A.2d 309 (1999).

The court concluded that, even if Crozier's performance had been deficient, the petitioner was not prejudiced because he "presented no evidence at the habeas trial to prove that had . . . Crozier reviewed the cognitive theory with . . . Zelman more thoroughly . . . Zelman's trial testimony would have been any different or that the outcome of the trial would have been different." The record supports this conclusion. At the habeas trial, after Zelman testified that Crozier had not reviewed the two theories of insanity with him prior to the petitioner's criminal trial, the petitioner's habeas counsel defined the two theories for Zelman by asking him the following question: "[D]id Mr. Crozier discuss with you that in order to be insane as a matter of law, a person must lack substantial capacity as a result of a mental disease or defect either to appreciate the wrongfulness of his conduct or to control his conduct according to the requirements of law?"

Zelman then testified regarding the petitioner's sanity at the time of the murder. His testimony was largely duplicative of the testimony he gave at the petitioner's criminal trial.[2] At both trials, Zelman testified that the petitioner was "out of touch with reality" at the time of the murder. Although Zelman further testified at the habeas trial that it was "astounding" to him for the

petitioner "not to qualify as mentally ill," he did not specify if or whether, in his opinion, the petitioner met the definition of cognitive insanity or volitional insanity as set forth by § 53a-13 (a), or both. Zelman also did not testify as to whether he would have changed his testimony had Crozier spent more time reviewing the difference between these two theories with him.

Because there is no evidence that Zelman would have testified differently had Crozier reviewed the cognitive theory with him more thoroughly, "[t]here is no reasonable probability that the outcome of the proceeding would have been different" if Crozier had spent more time explaining this difference to Zelman prior to the petitioner's trial. See *Martin* v. *Commissioner of Correction*, 155 Conn. App. 223, 232, 108 A.3d 1174, cert. denied, 316 Conn. 910, 111 A.3d 885 (2015); see also *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 554–55, 124 A.3d 1, cert. denied, 320 Conn. 910, 128 A.3d 954 (2015); *Nieves* v. *Commissioner of Correction*, supra, 51 Conn. App. 623–24.

On the basis of the foregoing, we conclude that the court properly determined that the petitioner had not met his burden of proving that Crozier rendered ineffective assistance of counsel for failing to adequately prepare his expert witness because the absence of that preparation, even if deficient, did not result in prejudice to the petitioner.

The judgment is affirmed.

In this opinion the other judges concurred.

* The listing of judges reflects their seniority status on this court as of the date of oral argument.

[1] "The affirmative defense of mental disease or defect, otherwise known as the insanity defense, is codified in General Statutes § 53a-13. . . . This defense has both a cognitive and a volitional prong. . . . Under the cognitive prong [of the insanity defense], a person is considered legally insane if, as a result of mental disease or defect, he lacks substantial capacity . . . to appreciate the . . . [wrongfulness] of his conduct. . . . Under the volitional prong, a person also would be considered legally insane if he lacks substantial capacity . . . to conform his conduct to the requirements of law." (Citation omitted; internal quotation marks omitted.) *State* v. *Madigosky*, supra, 291 Conn. 39.

[2] We note that Zelman touched on the cognitive aspect in his testimony at the criminal trial. For example, in describing how the petitioner had recounted the victim's murder, Zelman testified that "[the petitioner] had no recognition he did anything wrong and did not realize [the victim] was dead," and that "he said he didn't realize that [the victim] was dead, picked up the baby and placed the baby in a swing, and then he took one of his pills." In the circumstances of the case, however, especially in light of the petitioner's evident remorse immediately after the murder, it may well have been appropriate to concentrate on the volitional theory.