STATE OF CONNECTICUT *v.* RICHARD
SANTOS, JR.
(AC 31071)

Gruendel, Beach and Borden, Js.

Argued February 20—officially released November 5, 2013

*Heather M. Wood*, assistant public defender, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's

attorney, and *Stacey M. Miranda*, senior assistant state's attorney, for the appellee (state).

*Opinion*

BEACH, J. The defendant, Richard Santos, Jr., appeals from the judgment of conviction, rendered after a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1); unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a); and carrying a dangerous instrument in violation of General Statutes § 53-206 (a). On appeal, the defendant claims that (1) his right to confront an adverse witness was compromised by the trial court's limitations on the disclosure and use of that witness' psychiatric records, and (2) the court erred by denying his motion to dismiss or, in the alternative, his request for an adverse inference instruction, because purportedly material evidence was unavailable. We disagree with both claims, and, accordingly, affirm the judgment of the court.

The record reveals the following relevant facts and procedural history. In the early morning hours of February 3, 2007, a stabbing occurred at 79 Foster Street, a red brick crack house in Meriden. The house was being rented to E.P.,[1] the so-called "landlord" of the premises, who had resided there for seven years. The defendant had been staying in a room on the second floor for about six weeks. Drug addicts and dealers were frequent visitors to 79 Foster Street. The dealers would give E.P. crack cocaine in exchange for access to his chemically dependent houseguests. As the defendant described the scene: it was "[a] house where you can go get high and stay over the night; if you had drugs, the door was going to open."

---

[1] Because we discuss this witness' privileged psychiatric records, we refer to him by his initials.

During the winter of 2007, E.P. was "extremely dependent" on crack. On the day the stabbing occurred, he had been getting high for about twenty-four hours straight, taking breaks only to sleep. The defendant, likewise, had been smoking crack for several days straight and, consequently, was "[t]ired, exhausted, paranoid, [and] cracked out."

Kewon Potts had been hanging out at 79 Foster Street on the afternoon of February 2, 2007, and had had an argument with the defendant over what the defendant perceived to be a low offer by Potts to buy a large crack rock. The defendant apparently also had taken issue with Potts' poor treatment of Potts' girlfriend, who spent time at 79 Foster Street. After the argument, Potts left. Later that day, the defendant said of Potts that, if he returned, "there might be trouble."

At about 1 a.m., Potts was walking home from a friend's house on the corner of Foster and Lincoln Streets when he passed 79 Foster Street. E.P. and the defendant, who were on the porch, called out to Potts to come inside. Potts was led into the house; E.P. immediately barricaded the door. The defendant pulled a folding knife that he frequently carried and began attacking Potts, ultimately stabbing him in the head, left arm and chest. The struggle moved from the living room into the kitchen. Once there, E.P. blocked the back door, wielding a large rock as a weapon. The two men then attempted to force Potts into the basement. At this point, Potts' girlfriend burst into the kitchen and pleaded with E.P. and the defendant to stop.

The other persons present at 79 Foster Street became aware of the violent altercation and panicked; many fled the scene. In the midst of this chaos, E.P. and the defendant were distracted, and Potts was able to escape out the back door. He made his way to the driveway and then collapsed.

The defendant and E.P. left quickly thereafter. E.P. went to his mother's home in New Haven. The defendant went to Alberta Borelli's house, where his girlfriend, Mala Meekins, was staying. While there, the defendant made several telephone calls in which he stated that he had stabbed someone. E.P. and the defendant spoke by telephone from their respective locations after seeing local news reports of Potts' stabbing. The defendant was nervous because he thought he may have killed Potts. E.P. informed the defendant that Potts was alive, but in critical condition. The defendant later traveled to Michigan, where he discarded the knife.

The defendant was arrested and charged, by way of substitute information, with three counts: assault in the first degree, unlawful restraint in the first degree and possession of a dangerous instrument.[2]

E.P. was a witness for the state. Before trial commenced, the defendant filed a motion seeking in camera review of E.P.'s psychiatric records, which were in the possession of the Department of Correction.[3] The court granted the defendant's motion and reviewed the records after E.P.'s direct testimony had concluded. Four pages from the records were disclosed to the defendant. Defense counsel requested a continuance to research the mental disorders that the disclosed records indicated E.P. had been diagnosed with. To accommodate this request, the state agreed to take two of its

[2] On June 13, 2008, E.P. pleaded guilty to aiding and abetting assault in the first degree.

[3] Defense counsel had become aware of the potential that E.P. had mental health issues when a private investigator interviewed E.P. at the Garner Correctional Institution. The private investigator believed that Garner housed inmates with mental health issues. His suspicion that E.P. was laboring under a mental illness was reinforced by E.P.'s behavior during the interview; the private investigator testified that E.P. seemed to move slowly, "his speech was very slow and labored" and "[h]e appeared to be medicated." The defendant also introduced as an exhibit the transcript from E.P.'s sentencing, in which the court referred to E.P.'s history of psychological problems and his need for mental health treatment.

witnesses out of order so that the majority of E.P.'s cross-examination could be postponed until the next day, giving defense counsel the evening to prepare.[4]

In advance of defense counsel's cross-examination regarding E.P.'s mental health issues, the court defined the parameters of permissible use of the records. The court's position was, essentially, that such issues did not afford defense counsel the "opportunity to [conduct] a full scale assault on that condition." Accordingly, the court prohibited defense counsel from sharing the records with a social worker or any other mental health expert. The court did state that if there was a need to reconsider that decision in light of the testimony, it would do so.

The following morning, after defense counsel had had the opportunity to review the disclosed records, she noted that she had had difficulty deciphering certain abbreviations and notations in the records. She was able to discern from the records that E.P. had a history of experiencing auditory hallucinations. Defense counsel reiterated her request for permission to review the records with a mental health expert, asserting that, without such assistance, the records were "meaningless . . . ." The court denied that request, and further stated that it was considering vacating its earlier order disclosing the records. Defense counsel argued that the court's ruling would deny her client the right to effective assistance of counsel, his right to present a defense and his right to confront adverse witnesses. She therefore asked the court to strike E.P.'s testimony. That motion also was denied by the court.

---

[4] There was limited cross-examination of E.P. at the end of the day on December 4, 2008. Defense counsel elicited testimony regarding E.P.'s significant criminal history, his drug use and the general atmosphere at 79 Foster Street. Cross-examination was suspended when defense counsel was ready to delve into issues raised by the disclosures from E.P.'s mental health records.

The defendant then made an offer of proof, in which E.P. answered questions from defense counsel related to the disclosed records. Following the offer of proof, the court finalized the scope of questioning it would allow related to the mental health disclosure. The court agreed to permit testimony with respect to the medications E.P. was taking at the time of the incident and on the day of his testimony; any mental illnesses with which E.P. had been diagnosed, and whether he was affected by them on February 3, 2007, or during his testimony; and whether he was experiencing auditory or visual hallucinations on the day that Potts was stabbed. The court declined to permit cross-examination on whether E.P.'s mental illnesses had affected his thought processes at any other time.

Accordingly, E.P. testified that he had been diagnosed with schizoaffective disorder and bipolar disorder. He further stated that he was presently taking Lithium, Ativan, Abilify and Trazodone to treat these disorders. E.P. testified that he took these medications every day. The medication did not, according to E.P., affect his ability to perceive or remember. With respect to the time of the Foster Street stabbing, E.P. asserted that, although he had not been taking medication, he had not experienced symptoms from either of the disorders and did not suffer from hallucinations at that time.

After concluding her questioning related to E.P.'s mental health issues, defense counsel impeached his earlier testimony by raising other credibility issues. E.P. conceded that he had been "mis-telling" the police what occurred on February 3, 2007, when he was initially interviewed, about six weeks after the incident. At that time, he gave a statement that he had not witnessed the stabbing of Potts. E.P. additionally admitted that he hoped his testimony would result in a favorable modification of his sentence.

Thereafter, the defendant testified in his own defense. He admitted that he had fought with Potts, and that he had hit him in the face, kicked him in the groin and "stomped him." "When I fight," the defendant explained, "I try, at all odds, to win . . . ." He admitted that he always carried a knife, but stated that he could not remember if he was carrying it that day. He also conceded that Potts started bleeding at some point, which caused the defendant to panic and flee from the house because, in the defendant's words, "wherever there's blood, there's trouble."

In her closing argument, the defendant's attorney characterized her client's version of events as follows: "[H]e's taking responsibility for what he did, for his actions, for what he remembers." Defense counsel did not deny that the defendant had stabbed Potts; instead, she summarized the crux of his testimony as: "I don't know whether I stabbed Mr. Potts."

The jury found the defendant guilty on all charges. The court imposed a total effective sentence of fifteen years incarceration, suspended after twelve years, followed by three years probation. This appeal followed.

I

The defendant first claims that his sixth amendment right to confrontation of adverse witnesses was infringed by the extent of the court's limited disclosure of E.P.'s psychiatric records, certain limitations the court imposed on the scope of E.P.'s cross-examination and its denial of the defendant's request to enlist the assistance of an expert in interpreting the disclosed records. The defendant relatedly claims that the court erred by precluding his trial counsel from sharing the disclosed records with a mental health professional to prepare for cross-examination. We conclude that any error was harmless.

"A criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, otherwise privileged records . . . must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility." (Citations omitted.) *State* v. *Slimskey*, 257 Conn. 842, 853–54, 779 A.2d 723 (2001).

Any error in the limited disclosure of E.P.'s psychiatric records was harmless. When a claim regarding an evidentiary ruling is of constitutional magnitude, the state has the burden of proving that the constitutional error was harmless beyond a reasonable doubt. *State* v. *Dehaney*, 261 Conn. 336, 355 n.12, 803 A.2d 267 (2002), cert. denied, 537 U.S. 1217, 123 S. Ct. 1318, 154 L. Ed. 2d 1070 (2003). "Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result of the trial." (Citation omitted; internal quotation marks omitted.) *State* v. *Madigosky*, 291 Conn. 28, 45, 966 A.2d 730 (2009).

The state argues that any error was harmless because it "presented a strong case involving multiple independent eyewitnesses who corroborated E.P.'s testimony that the defendant stabbed Potts . . . ." We conclude that the state has met its burden in proving that any error was harmless.

Several eyewitnesses testified that the defendant stabbed Potts. Frederick Elbert testified that on the morning in question, while he was upstairs he heard a commotion downstairs. He ran downstairs to the kitchen and saw the defendant stabbing Potts. Jolie Shelton testified that she saw the defendant and Potts wrestling in the kitchen and, afterward, saw blood where the encounter had occurred. Potts testified that the defendant stabbed him seven times, and he showed the jury his scars. Additionally, Meekins testified that she allowed the defendant to come to the house where she was staying on February 3, 2007, because he "had did something bad" and "needed some place to go . . . ." While the defendant was there, Meekins overheard him call "five or six people" to tell them that he had stabbed someone. She also noticed specks of blood on the defendant's white sneakers. The following day, Meekins saw the defendant with a folding knife. See *State* v. *Madigosky*, supra, 291 Conn. 45 (harmlessness analysis should consider "whether the testimony was cumulative, [and] the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points" [internal quotation marks omitted]).

The defendant's testimony was damaging to his case. In his testimony, the defendant admitted to participating in a serious assault of Potts. The defendant admitted to stomping and kicking Potts, and stated that he was fighting "to win . . . ." He further testified that he always carried a knife, but that he could not recall whether it was in his possession that day. When the

defendant noticed that Potts was bleeding, he sensed trouble and fled. As defense counsel put it in closing argument, the defendant was willing to take responsibility for what he remembered doing to Potts. As to whether he stabbed Potts, the defendant did not deny stabbing him, nor did he accuse E.P.; he simply claimed not to remember stabbing Potts.

The defendant was able to cross-examine E.P. about his mental illness to some extent. As noted previously, the jury heard evidence regarding his history of schizoaffective disorder and bipolar disorder, as well as his having experienced hallucinations in the past. As argued by the dissent, the jury did not hear details of diagnosis and treatment, nor did it receive an explanation of the disorders. Even the limited disclosure, however, provided a general sense of E.P.'s mental health history. Furthermore, E.P.'s credibility was effectively impeached many times over, not only with respect to his mental health and substance abuse issues, but also because of his conviction for his own role in the stabbing, his inconsistent statements, his significant criminal history, and his admitted desire for a sentence modification. It is exceedingly unlikely that the jury relied uncritically on E.P.'s testimony. See State v. Madigosky, supra, 291 Conn. 45 (extent of cross-examination otherwise permitted relevant to determination of whether error was harmless).

In light of the defendant's rather devastating testimony, in conjunction with testimony from multiple eyewitnesses, the state has met its burden of proving that any error was harmless beyond a reasonable doubt.

II

The defendant next claims that the court erred by rejecting his motion to dismiss, or alternatively, denying his request for an adverse inference instruction, based on the unavailability of two kitchen knives seized from

79 Foster Street, which were destroyed pursuant to a court order following the disposition of the state's case against E.P.[5] The following additional facts are relevant to the resolution of this issue.

Before trial, the defendant filed a motion to dismiss, pursuant to *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995), aff'd after remand, 39 Conn. App. 617, 667 A.2d 68, cert. denied, 235 Conn. 938, 668 A.2d 376 (1995), or, alternatively, requested an instruction that the jury could draw an adverse inference based on the state's failure to preserve certain evidence. The motion was based on the destruction of, among other items, two knives that were seized from a "utensil basket" next to the kitchen sink at 79 Foster Street.

During a pretrial hearing on November 25, 2008, the court heard arguments on the defendant's motion. It was undisputed that the knives were destroyed pursuant to a court order some time after E.P.'s sentencing in June, 2008. Although the prosecutor explained that the court clerk's office automatically dockets a motion for the return or destruction of seized property once a criminal case has been disposed of, the defendant argued that the failure to preserve this evidence constituted "extreme negligence" or recklessness on the part of the state. Defense counsel argued that the destroyed knives, if tested for DNA evidence, might have supported the theory that E.P., and not the defendant, had perpetrated the stabbing.[6] The court first denied the motion to dismiss, stating that the defendant had proffered "merely . . . a suggestion that, had the evidence been there, it would have been exculpatory."

---

[5] The court characterized the defendant's motion as a "request of the court . . . [as] a motion to dismiss, or, in the alternative, the adverse instruction regarding the destruction of the seized property."

[6] If one of these knives had been used in the stabbing, the theory goes, then the defendant's discarded knife would not have been used in the crime.

Before ruling on the defendant's request for an adverse inference instruction to the jury, the court heard testimony regarding the two knives from E.P. and a detective from the Meriden Police Department, who had executed the search warrant and seized them. E.P. testified that he owned very few utensils, probably just "a spoon, fork, and butter knife, and a steak knife." He also identified a rack that was located next to the kitchen sink at 79 Foster Street that he used for storing dishes. He could not recall whether there were any knives in the rack on the day of Potts' stabbing.

Detectives William Grodzki and Robert Pocobello of the Meriden Police Department described the circumstances of the execution of two search warrants at 79 Foster Street. Pocobello was part of the group of officers that executed the warrants. He recalled that two knives were seized from a "utility basket" in the kitchen. Pocobello further testified that he did not "see anything visible," such as blood, on the knives. Grodzki testified that most of the evidence seized from 79 Foster Street had been "ordered destroyed."

The court denied the request for an adverse inference instruction. The court specifically noted that the knives were destroyed pursuant to a court order and had "nothing to do . . . with police intervention . . . ."

In determining whether the unavailability of evidence has deprived the defendant of due process of law, "the trial court must balance the totality of the circumstances surrounding the missing evidence, including the following factors: the materiality of the missing evidence, the likelihood of mistaken interpretation of it by witnesses or the jury, the reason for its nonavailability to the defense and the prejudice to the defendant caused by the unavailability of the evidence." (Internal quotation marks omitted.) *State* v. *Morales*, supra, 232 Conn. 727.

We note, first, that the court did not err in rejecting the motion to dismiss. The trial court has the discretion to "fashion [a] remedy that appropriately ameliorates or offsets the prejudice that the defendant has suffered as a result of the unavailability of the evidence." Id., 729. The remedy of dismissal, "because it is the most drastic remedy available . . . ought to be reserved for those cases in which no lesser remedy can plausibly vindicate the defendant's right to a fair trial." Id., 739–40 (*Borden, J.,* concurring).

The totality of the circumstances surrounding the unavailability of the kitchen knives similarly militated against the need for an adverse inference instruction. First, the knives were not material evidence. The mere fact that evidence was deemed interesting enough, at one time, to be seized by the police does not make it material. "The measure of materiality is whether there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (Internal quotation marks omitted.) *State* v. *Joyce,* 243 Conn. 282, 301, 705 A.2d 181 (1997), cert. denied, 523 U.S. 1077, 118 S. Ct. 1523, 140 L. Ed. 2d 674 (1998).

The superficially innocuous placement of the knives in a drying rack next to the sink, coupled with testimony that there were no visible bloodstains on them, supports the trial court's rulings. The lack of apparent bloodstains also undermines, to a degree, the defendant's contention that DNA testing could have been performed fruitfully on the knives. See *State* v. *Morales,* 39 Conn. App. 617, 623–24, 667 A.2d 68 (viability of scientific testing "purely speculative"), cert. denied, 235 Conn. 938, 668 A.2d 376 (1995). Last, the defendant did not request testing of the evidence until September 2, 2008, although counsel had been appointed in May, 2007. "The fact that a defendant failed to request the evidence goes to the issue of materiality and whether the defendant

deemed it significant." *State* v. *Morales*, supra, 232 Conn. 712 n.7; see also *State* v. *Joyce*, supra, 243 Conn. 302 ("defendant's argument that the [unavailable evidence] was highly relevant [was] undermined by the fact that there was no evidence that the defendant ever requested a test" [internal quotation marks omitted]).

The second factor we must consider is the likelihood of mistaken interpretation of the missing evidence by witnesses or the jury. "[T]he likelihood of such a mistake [by the jury and witnesses] can be minimized at the trial by permitting testimony on the issue . . . ." (Internal quotation marks omitted.) *State* v. *Polanco*, 126 Conn. App. 323, 334, 11 A.3d 188 (2011), rev'd in part on other grounds, 308 Conn. 242, 61 A.3d 1084 (2013). The unavailability of the knives was explained by the detectives; it was "ordered destroyed." The failure to preserve the evidence was rational given that the knives were being stored in such a manner that suggested to the authorities that they were being used as utensils and not as dangerous instruments. See *State* v. *Morales*, supra, 232 Conn. 723 (police not required to "preserve every shred of physical evidence, every object it seizes from a crime scene, no matter how remote or tangential to the case the item seems to be").

The third factor addresses the reasons for the unavailability of the evidence and requires an examination of the motive underlying the loss of the evidence. Id., 722–23. "In examining the motives . . . our courts have considered such factors as whether the destruction was deliberate and intentional rather than negligent . . . or done in bad faith or with malice . . . or with reckless disregard . . . or calculated to hinder the defendant's defense, out of other animus or improper motive, or in reckless disregard of the defendant's rights." (Internal quotation marks omitted.) *State* v. *Polanco*, supra, 126 Conn. App. 334–35. The evidence in this case was destroyed pursuant to a court order

and, therefore, was not likely done in bad faith or in an effort to undermine the defendant's case.

Finally, we must consider whether the unavailability of the knives caused prejudice to the defendant. As we have already observed, we can only speculate as to whether the knives would have been beneficial to the defense. Moreover, the defendant's theory that E.P. was the stabber was contrary to the weight of the evidence. "In measuring the degree of prejudice to an accused caused by the unavailability of evidence, the trial court properly may evaluate the strength or weakness of the state's case, as well as the corresponding strength or weakness of the defendant's case." *State* v. *Morales*, supra, 232 Conn. 727 n.22. Potts, as well other witnesses, identified the defendant as the stabber. There was also testimony that the defendant had admitted stabbing Potts in several telephone calls he made in the aftermath of the assault. Significantly, the defendant did not deny that he had been involved in a serious altercation with Potts, or that he regularly carried a knife for protection; he merely stated that he could not remember whether he had stabbed him.

The judgment is affirmed.

In this opinion GRUENDEL, J., concurred.

BORDEN, J., dissenting. The defendant's first, and principal, claim is that the trial court abused its discretion in limiting his access to the mental health records of the state's witness, E.P.,[1] and in precluding the defendant's counsel from even showing those records to an expert, thereby violating his constitutional right to confront the witnesses against him. The majority bypasses the substance of this claim and concludes, without deciding it or analyzing its merits, that "[a]ny error in

---

[1] In this dissenting opinion, I refer to E.P. alternatively as "the witness."

the limited disclosure of E.P.'s psychiatric records was harmless," because "the state has met its [constitutional] burden in proving that any error was harmless." I disagree.[2] My independent review of the witness' mental health records leads me to a contrary conclusion. I conclude that: (1) the trial court violated the defendant's constitutional right to confront the witnesses against him in precluding the defendant's access to most of the witness' mental health records and in precluding the defendant's counsel from even showing those records to an expert; and (2) those rulings were not harmless beyond a reasonable doubt.

I first note that it is necessary to discuss the records that are in dispute in some detail because, contrary to the majority's mode of analysis, which moves directly to the question of harm without first addressing the propriety of the trial court's rulings, the records are directly relevant to the question of harm. And indeed, the question of harm cannot be considered in their absence. That is because, as the majority notes but does not apply, where the defendant's confrontation rights have been violated, the question of harm depends on the totality of the evidence at trial. *State* v. *Madigosky*, 291 Conn. 28, 45, 966 A.2d 730 (2009). "If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id. The question of harm depends on a number of factors, such as the importance of the witness' testimony, whether it was cumulative, the degree of corroboration or contradiction on material points, the extent of cross-examination permitted, and the strength of the state's case. Id. *"Most importantly, [this court] must examine the impact of the evidence on the trier of fact and the result of the trial."* (Emphasis added; internal quotation marks omitted.) Id. Thus, we cannot properly assess the question of

---

[2] I agree with the majority's treatment of the defendant's other claims.

harm in this case without also assessing the potential impact on the jury of the failure to disclose the witness' psychiatric records to the defendant's attorney. That obviously requires a detailed examination of the material in question.

Because the majority does not address the propriety of the trial court's ruling, however, it is necessary that I do so. "A criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. *Delaware* v. *Fensterer*, 474 U.S. 15, 19, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985) . . . . Thus, in some instances, otherwise privileged records, like the ones in this case, must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. . . .

"The need to balance a witness' statutory privilege to keep psychiatric records confidential against a defendant's rights under the confrontation clause is well recognized. . . . The test and the associated burdens imposed on a defendant are equally well chronicled. If, for the purposes of cross-examination, a defendant believes that certain privileged records would disclose information especially probative of a witness' ability to comprehend, know or correctly relate the truth, he may, out of the jury's presence, attempt to make a preliminary showing that there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness. . . . If in the trial court's judgment the defendant successfully makes this showing, the state must then obtain the witness' permission for the court to inspect the records in camera. A witness' refusal to consent to such an in

camera inspection entitles the defendant to have the witness' testimony stricken. . . .[3]

"Upon inspecting the records in camera, the trial court must determine whether the records are especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences. . . . If the court determines that the records are probative, the state must obtain the witness' further waiver of his privilege concerning the relevant portions of the records for release to the defendant, or have the witness' testimony stricken. If the court discovers no probative and impeaching material, the entire record of the proceeding must be sealed and preserved for possible appellate review. . . . Once the trial court has made its inspection, the court's determination of a defendant's access to the witness' records lies in the court's sound discretion, which we will not disturb unless abused. . . .

"Access to confidential records should be left to the discretion of the trial court which is better able to assess the probative value of such evidence as it relates to the particular case before it . . . and to weigh that value against the interest in confidentiality of the records. . . . [T]he linchpin of the determination of the defendant's access to the records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality and disclosing them to the defendant in order to protect his right of confrontation." (Citations omitted; emphasis added; internal quotation marks omitted.) State v. Slimskey, 257 Conn. 842, 853–57, 779 A.2d 723 (2001).

On the basis of the disclosure of the four pages of the defendant's psychiatric records that the court did

---

[3] In the present case, the court obtained this consent from the witness and examined his records in camera.

allow defense counsel to examine, defense counsel was able to elicit from the witness that he had been diagnosed with schizoaffective disorder and bipolar disorder, and that he was *presently* taking certain medications *daily*, namely, Lithium, Ativan and Trazadone, but that those medications did not affect his ability to perceive or remember. Of course, the jurors were not told, because there was no expert to tell them, what specifically "schizoaffective disorder" or "bipolar disorder" are, including the symptoms they may display, or what symptoms Lithium, Ativan and Trazadone may carry with them.[4]

I next address, as a preliminary matter, the state's contention that the defendant set forth "a hollow complaint" in asserting that certain medications, dosages and codes provided in the disclosed records were too complicated for counsel to decipher and, therefore, that she needed to show them to and discuss them with an expert. The state argues that "the need for expert consultation is undermined by appellate counsel's demonstrated ability to discover the uses and side effects

---

[4] The state argues that the trial court's ruling did not prevent the defendant from calling an expert to answer hypothetical questions that could be based on defense counsel's examination of the four pages of the witness' records and, therefore, the trial court's ruling precluding her from even showing the records to an expert was a proper balancing of the witness' privacy rights and the defendant's sixth amendment confrontation rights. Although it is certainly true that defense counsel could have done so, it is difficult to consider seriously such a procedure as an adequate surrogate for an effective sixth amendment challenge to the credibility of the witness. Without the ability to examine the records themselves or even to discuss them with the defendant's counsel, the expert would be testifying virtually in a factual vacuum, and would not be able to answer effectively even a hypothetical question about the symptoms that such a witness was likely to display. That, of course, assumes that counsel could glean enough information from her independent review so as to formulate such probative questions. In any event, as I will demonstrate, the impropriety of the trial court's ruling precluding the defense counsel from examining the rest of the records and discussing them with an expert went far beyond the meager four pages that it permitted defense counsel to examine.

of the various listed medications by reference to readily available Internet sources . . . [referring to various Internet websites cited in the defendant's brief]." "Likewise," the state asserts, "the 'codes' set forth in the disclosed documents relating to the frequency of medication, for example, 'BID,' and 'QID,' are easily decoded . . . [citing to various other Internet websites]."

It should go without saying that, simply because a search on the Internet (or in a medical dictionary, for that matter) would disclose to defense counsel what a particular medical term may mean, does not mean that counsel would be in a position to use that meaning in a trial without presenting an expert witness to explain it. Counsel, having learned from the disclosed records that the witness had been diagnosed with schizoaffective disorder, and having consulted the Internet to learn what that means, cannot simply stand up and ask something like, "Isn't it true, E.P., that your diagnosis of schizoaffective disorder bipolar type means that you may experience hallucinations, which means seeing, hearing or sensing things that are not there?"[5] If challenged on the grounds that he is basing his question on matters not in evidence, what is he supposed to say? "It's on the Internet"? And even if he could ask such a question, how could the witness answer credibly?

My point here is simply that, although the Internet is a very useful tool for many purposes, its usefulness as an aid to effective—and admissible—cross-examination in a case such as this is quite limited. The Internet can serve only as a starting point for counsel to learn enough to take the necessary next steps in order to conduct an admissible cross-examination or to present expert testimony regarding an adverse witness' credibility. Thus, simply because medical records may contain

[5] See my discussion of this diagnosis, contained in the sealed materials, in the text and footnotes of this opinion.

material that, if explained properly, would affect a witness' credibility, does not mean that defense counsel has been given everything he or she needs to use that material. Having learned something from the Internet does not enable defense counsel to use that information in cross-examination, if she wishes to do so, and does not enable her to bring that information to the ken of the jury. That would require an expert witness' testimony. Consequently, my use of Internet sites in this opinion is limited to its proper purpose: simply to indicate that, had the sealed materials been disclosed to the defendant's counsel, she could have consulted similar sites to learn of their potential side effects bearing on the witness' credibility and then, using that information, consulted with and retained an appropriate expert for purposes of testifying to those side effects. Thus, the court also abused its discretion in precluding the defendant's counsel from even showing the disclosed records to an expert for the purposes of aiding in the cross-examination of the witness.

I now return to the witness' medical records that the court deemed unnecessary to disclose to the defendant. As I indicated previously, "[t]he linchpin of the determination of the defendant's access to [such] records is whether they sufficiently disclose material especially probative of the ability to comprehend, know and correctly relate the truth . . . so as to justify breach of their confidentiality . . . ." (Internal quotation marks omitted.) *State* v. *Slimskey*, supra, 257 Conn. 856–57. The witness' records easily meet that standard.

The trial court examined in camera the entire set of the witness' medical records, including his mental health records that had been subpoenaed from the Department of Correction. After that examination, the court ordered disclosure of four pages of the witness' mental health records to the defendant, which the majority has discussed, and ordered that the rest remain

sealed. That sealed portion of the witness' entire set of medical records constitutes 344 pages. In my view, of those 344 pages, no less than seventy-eight, or almost one in four, contain notations that, if shown to the jury and explained by an appropriate expert witness familiar with the terms used therein, could have had a devastating effect on the jury's assessment of the witness' credibility.[6] Thus, at the least, the defendant should have had access to them and been permitted to show them to an appropriate professional. This would have thereby enabled an effective cross-examination of the witness and presentation to the jury of expert testimony impugning the witness' credibility.

The undisclosed records reveal an undeniable correlation between the witness' diminished mental health and the timing of the underlying crimes and his trial testimony. The crimes in the present case occurred on February 3, 2007, and the witness testified as an eyewitness to those crimes on December 4 and 5, 2008. His medical records begin on April 28, 2006, approximately nine months before the crime, and end on November 17, 2008, only about six weeks before the trial. Thus, they span both the time of the crimes and essentially the time of his testimony.

I first address in detail the witness' course of medications. The records indicate that, during that time span, the witness was on a regular and repeated course of three medications for serious mental illness: Ativan; Lithium; and Trazodone—often all three at the same time. By my count, these were prescribed for and administered to him approximately fifty times, for periods ranging from thirty to ninety days at a time. Ativan has as potential side effects "amnesia, memory impairment,

---

[6] Rather than cite to and quote from all seventy-eight such entries, I summarize them in the text of this opinion.

confusion," and "hallucinations . . . ."[7] Lithium has as potential side effects "confusion" and "hallucinations (seeing things or hearing voices that do not exist)."[8] Trazodone has as potential side effects "decreased ability to concentrate or remember things" and "confusion . . . ."[9]

In addition, numerous other entries in the witness' medical records corroborate the notion that defense counsel should have had access to them in order to build a case against his credibility on the basis of his significantly impaired mental state. He was diagnosed with "schizoaffective disorder" and "schizoaffective disorder bipolar type" in several entries, the most telling one on January 24, 2007, less than two weeks before the date of the crimes. The Internet—again—tells us that "[w]hen people with schizoaffective disorder experience psychotic symptoms, they can include: Seeing,

[7] National Institutes of Health, U.S. National Library of Medicine, "ATIVAN (lorazepam) tablet" (last modified July, 2010), available at http://dailymed.nlm.nih.gov/dailymed/lookup.cfm?setid=07cae057-a593-4e4d-a478-2d7fc9f06857 (last visited September 30, 2013) (copy contained in the file of this case in the Supreme and Appellate Court clerk's office).

[8] National Institutes of Health, U.S. National Library of Medicine, Lithium, "What side effects can this medication cause?" (last modified September 25, 2013), available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html (last visited September 30, 2013) (copy contained in the file of this case in the Supreme and Appellate Court clerk's office).

[9] National Institutes of Health, U.S. National Library of Medicine, Trazodone, "What side effects can this medication cause?" (last modified September 25, 2013), available at http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681038.html (last visited September 30, 2013) (copy contained in the file of this case in the Supreme and Appellate Court clerk's office). I acknowledge that I have not done an Internet search to find out whether being administered these three medications, all at the same time, regularly over a lengthy period of time, would increase the risk of the side effects of hallucinations and other mental disabilities that these medications carry with them. Indeed, that is precisely the type of information that should not be left to the puny efforts of a layperson (in the medical sense) like me, or the defendant's counsel; instead, it should be presented to a medical expert for his or her opinion—which, of course, the defendant's counsel was prohibited from doing by the trial court's unnecessary restriction on even disclosing the records to such an expert.

hearing, or sensing things that are not there (hallucinations) . . . [and] [b]eing less able to speak or think clearly . . . ."[10] In addition, there are numerous entries in E.P.'s medical records along the following lines: "serious mental illness"; "hallucinations"; "exacerbation of serious mental illness"; "alteration of thought process"; "auditory (particularly command)/visual hallucinations or delusions"; "altered thought process"; "acute, negative, psychotic symptoms"; "history of chronic mental illness resulting in multiple psychiatric hospitalizations"; "claims to hear voices in the past to hurt his cell[mate]"; "alteration in thought process [resulting from] mental illness"; and "need for false belief—delusions—irrational thoughts." Finally, the records indicate that the witness was often actively suicidal, attempting to take his own life on at least five occasions, from 1986 to March, 2007, one month after the crimes to which he testified; and he often voiced suicidal ideation, wanting to cut his wrists, hang himself, and throw himself from his cell block tier.

In sum, here we have medical records of a witness disclosing that, at times directly relevant to both his witnessing of the crimes charged and his testimony, he was taking psychotropic drugs that may have caused him to be hallucinatory, delusional, with amnesia, memory impairment, and confusion. He suffered from schizoaffective disorder, which may bring with it hallucinations and an inability to think clearly. The same records indicate, as a clinical matter, that he suffered from serious mental illness, hallucinations, delusions, altered thought processes, acute psychotic symptoms, and irrational thoughts. And he was actively suicidal

---

[10] INVEGA, INVEGA For Schizoaffective Disorder, "What are the psychotic symptoms of schizoaffective disorder?" (last modified August 8, 2013), available at http://www.invega.com/schizoaffective-disorder-psychotic-symptoms (last visited September 30, 2013) (copy contained in the file of this case in the Supreme and Appellate Court clerk's office).

and suffered from suicidal ideation. These are the paradigmatic indicators of a potential lack of credibility that a jury needs to have, because they clearly "disclose material especially probative of [the witness'] ability to comprehend, know and correctly relate the truth . . . ." (Internal quotation marks omitted.) *State* v. *Slimskey*, supra, 257 Conn. 856.

The four pages disclosed to defense counsel were insufficient to build such a fortified challenge to the witness' credibility. The pervasiveness of the entries documenting the witness' mental impairments is damaging evidence, in and of itself, not to mention the correlation between these entries and the timing of the underlying crimes and the witness' trial testimony. At some point, I contend, a difference in number becomes a difference in kind, and this is clearly such a case.

The fact, apparently relied upon by the trial court, that the witness denied having any hallucinations or delusions at the time of the crimes and of his testimony, is far from conclusive—any more than a witness who denies he is lying when he describes a crime that he claims to have witnessed, but whose records indicate a pattern of pathological lying. That is the function of cross-examination—to expose the lack of credibility in both the denial of lying and in the underlying lack of truth of the direct testimony—and to permit the jury, not the presiding judge, to decide the credibility of the witness. Similarly, the fact that the trial court listened to the witness and determined that his credibility was not impaired, as the state urges upon us, does not suffice to save its rulings.

First, the trial court itself is not an expert in psychiatry; thus, even though it examined the records in camera, it cannot be deemed to understand the meaning of all of the terms contained therein or the symptoms they implicate. Second, those records are not evidence; thus,

the trial court was, presumably, gauging the witness' credibility in their absence. Third, this was a jury trial; the credibility of the witness was for the jury, not the trial court, to determine. Such a determination could not adequately be done with the witness' psychiatric records sealed in a black box, as it were. The defendant should have had access to these records in order to have had the opportunity to bring to the jury's attention the gross potential defects in the witness' credibility. I conclude that the defendant's right of confrontation was violated by the court's denial of access to the undisclosed records, including the court's ban on showing them to, and discussing them with, an expert.

Having concluded that the defendant's constitutional right of confrontation was violated, I turn next to the question of harm. It is axiomatic that, when a criminal defendant's constitutional rights have been violated, the state bears the burden of establishing lack of harm beyond a reasonable doubt. *State* v. *Galarza*, 97 Conn. App. 444, 450, 906 A.2d 685, cert. denied, 280 Conn. 936, 909 A.2d 962 (2006). In my view, the state has not met that burden in the present case.

I first note that the precise issues for the jury to decide, in light of the defendant's testimony, were whether he stabbed the victim and, if so, whether he did so with the requisite intent, namely, "[with] intent to cause serious physical injury" to the victim. General Statutes § 53a-59 (a).[11] The defendant testified, in essence, that although he intended to fight the victim with his fists and did so, and although he did carry a knife, because he was high on drugs at the time of the

---

[11] The defendant's principal conviction, and the one on which the court imposed the most lengthy sentence, was for assault in the first degree in violation of § 53a-59 (a), which provides in relevant part: "A person is guilty of assault in the first degree when: (1) With intent to cause serious physical injury to another person, he causes such injury to such person or to a third person by means of a deadly weapon or a dangerous instrument . . . ."

fight, he could not recall stabbing the victim and had no intent to do so.

The question of harm depends on the totality of the evidence at trial. *State* v. *Madigosky*, supra, 291 Conn. 45. "If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless." (Internal quotation marks omitted.) Id. In the present case, we must consider both the witness' testimony and the potential effect of the excluded records on that testimony. The question of harm depends on a number of factors, such as the importance of the witness' testimony, whether it was cumulative, the degree of corroboration or contradiction on material points, the extent of cross-examination permitted, and the strength of the state's case. Id. "Most importantly, [this court] must examine the impact of the evidence on the trier of fact and the result of the trial." (Internal quotation marks omitted.) Id.

Contrary to the state's argument, apparently endorsed by the majority, that it presented "a strong case" on both issues—who did the stabbing, and the defendant's state of mind—the record does not bear that out. The crimes took place at a crack house. All of the state's critical witnesses, including the victim, were either convicted felons or crack addicts who were high on crack at the time and who gave one or more conflicting statements to the police.

The victim, who ultimately testified that it was the defendant who stabbed him, also testified that, when he gave his detailed tape-recorded statement to the police at the hospital, he was heavily medicated and did not remember giving the statement. He also testified that he left out of the statement the names of his assailants, and he initially identified E.P. in a photographic lineup as the one who had assaulted him—not the defendant. He later identified the defendant.

Jolie Shelton, one of the state's witnesses, had multiple felony and larceny convictions and was doing drugs the day of the stabbing. She initially told the police that she did not want to give a statement because she had not seen anything at the time of the crimes. She then testified that she was present, and saw the victim, the defendant, and E.P. scuffling. She also testified that she did not see the stabbing, and did not see a knife during the scuffle.

Frederick Elbert, another of the state's witnesses, also had multiple felony convictions and lied to the police multiple times during the investigation. He initially told the police that he had not seen anything, and that he was in the process of leaving the crack house when the victim entered. Months later, he again told the police that he had not been present when the stabbing took place. In his testimony at trial, he testified for the first time that the defendant was the stabber.

Mala Meekins, another state's witness, was not at the scene when the stabbing took place. She testified that the defendant visited her at a friend's house after the stabbing where she overheard him telling someone on his cell phone that he had stabbed someone. He had red specks on his sneakers, and later she saw him carrying a folding knife.

Finally, the witness, E.P., testified as an eyewitness to the stabbing. He was originally charged with the assault because the victim had named him, not the defendant, as the stabber. He ultimately pleaded guilty to being an accessory to the stabbing, as well as to another, unrelated felony charge, and received a much reduced sentence, as well as the dismissal of eight other charges, as a result of his testimony.

He testified that he had been doing drugs for twenty-four hours straight before the stabbing, and was high when the stabbing took place. He denied the version

of events, testified to by the other persons present, that he had been involved in the attack on the victim. He gave the most detailed testimony that the defendant was the stabber.

He was the first person arrested because the victim had named him as the stabber. He initially told the police that he had not even been at the crack house at the time of the stabbing; later he told them he was there but did not see the stabbing. It was not until he was charged with the crime, on the basis of the victim's statement that he was the stabber, that he implicated the defendant as the stabber. He admitted that he had lied to the police when he had given them a false reason as to why the victim had falsely accused him. He also testified that, while he and the defendant were in a cell awaiting a court appearance, the defendant told him that he, the witness, should not have given the police a statement. There was also evidence, through a correction officer, that the two then fought and had to be separated by officers.

Given the importance of the witness' ultimate testimony to the state's case, as the most detailed account of the stabbing, and containing evidence of a purported guilty admission made by the defendant to the witness, I conclude that the state has not met its burden of establishing the lack of harm beyond a reasonable doubt by the improper sealing of the witness' psychiatric records and the prohibition on showing those records to and discussing them with an expert. The witness' testimony cannot be considered as merely cumulative of other evidence in the case because of his central role in the stabbing, and, although corroborated in some respects, his testimony was also contradicted by his prior statements; the state's case, dependent as it was largely on the testimony of witnesses with significant credibility flaws, was not strong; and the extent of the permitted cross-examination of E.P. cannot come close

to what it should have been had the sealed material been made available to the defendant and to an expert of his choice. Considering the likely "impact of the [excluded] evidence on the trier of fact and the result of the trial," the improper denial of access to the witness' psychiatric records "may have had a tendency to influence the judgment of the jury"; therefore, it cannot be considered harmless beyond a reasonable doubt. (Internal quotation marks omitted.) *State* v. *Madigosky*, supra, 291 Conn. 45.

I recognize that there was evidence of the defendant's flight and statements of the defendant as to consciousness of guilt, as the state points out. And I recognize, of course, that, although the state's case was not strong, it was certainly strong enough to have convinced the jury. I cannot escape the conclusion, however, that the refusal of the court to give the defendant access to the witness' devastating psychiatric records "may have had a tendency to influence" its verdict; (internal quotation marks omitted); id.; and therefore cannot be considered harmless beyond a reasonable doubt.

I therefore dissent, and would reverse the judgment of conviction and remand the case for a new trial.