******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* RICHARD SANTOS, JR.
(SC 19254)

Rogers, C. J., and Palmer, Zarella, Eveleigh, Espinosa and Robinson, Js.

*Argued January 9—officially released August 25, 2015*

*James B. Streeto*, assistant public defender, with whom, on the brief, was *Ross W. Hakala*, law student intern, for the appellant (defendant).

*Timothy F. Costello*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *Stacey M. Miranda*, senior assistant state's attorney, for the appellee (state).

*Opinion*

ESPINOSA, J. In this certified appeal, the defendant, Richard Santos, Jr., claims that his constitutional rights to confrontation, to present a defense and to due process[1] were violated when the trial court disclosed only four pages of the psychiatric records of a state's witness, E.P.,[2] and prohibited the defendant from consulting with an expert witness as to those four disclosed pages. The defendant was convicted, following a jury trial, of assault in the first degree in violation of General Statutes § 53a-59 (a) (1), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and carrying a dangerous instrument in violation of General Statutes § 53-206 (a). The defendant appealed to the Appellate Court, claiming, inter alia, that his right to confront E.P. was compromised by the trial court's limitations on the disclosure and use of E.P.'s psychiatric records. *State* v. *Santos*, 146 Conn. App. 537, 544, 78 A.3d 230 (2013). The Appellate Court affirmed the judgment of conviction; id., 539; and we granted the defendant's petition for certification to appeal limited to the following issue: "Did the Appellate Court properly conclude that the defendant's rights under the confrontation clause were not violated by virtue of the trial court's refusal to require disclosure of certain psychiatric records of the eyewitness E.P.?" *State* v. *Santos*, 311 Conn. 927, 86 A.3d 1056 (2014). We conclude that any error the trial court committed in releasing only four pages of E.P.'s psychiatric records and in limiting the defendant's ability to consult with an expert as to the disclosed pages was harmless beyond a reasonable doubt. Accordingly, we affirm the judgment of the Appellate Court.

The opinion of the Appellate Court sets forth the following facts, which the jury reasonably could have found, describing the incident which led to this appeal. "In the early morning hours of February 3, 2007, a stabbing occurred at 79 Foster Street, a red brick crack house in Meriden [house]. The house was being rented to E.P., the so-called 'landlord' of the premises, who had resided there for seven years. The defendant had been staying in a room on the second floor for about six weeks. Drug addicts and dealers were frequent visitors to [the house]. The dealers would give E.P. crack cocaine in exchange for access to his chemically dependent houseguests. As the defendant described the scene: it was '[a] house where you can go get high and stay over the night; if you had drugs, the door was going to open.'

"During the winter of 2007, E.P. was 'extremely dependent' on crack. On the day the stabbing occurred, he had been getting high for about twenty-four hours straight, taking breaks only to sleep. The defendant, likewise, had been smoking crack for several days straight and, consequently, was '[t]ired, exhausted,

paranoid, [and] cracked out.'

"Kewon Potts [the victim] had been hanging out at [the house] on the afternoon of February 2, 2007, and had had an argument with the defendant over what the defendant perceived to be a low offer by [the victim] to buy a large crack rock. The defendant apparently also had taken issue with [the victim's] poor treatment of [the victim's] girlfriend, who spent time at [the house]. After the argument, [the victim] left. Later that day, the defendant said of [the victim] that, if he returned, 'there might be trouble.'

"At about 1 a.m., [on February 3, 2007, the victim] was walking home from a friend's house on the corner of Foster and Lincoln Streets when he passed [the house]. E.P. and the defendant, who were on the porch, called out to [the victim] to come inside. [The victim] was led into the house; E.P. immediately barricaded the door. The defendant pulled a folding knife that he frequently carried and began attacking [the victim], ultimately stabbing him in the head, left arm and chest. The struggle moved from the living room into the kitchen. Once there, E.P. blocked the back door, wielding a large rock as a weapon. The two men then attempted to force [the victim] into the basement. At this point, [the victim's] girlfriend burst into the kitchen and pleaded with E.P. and the defendant to stop.

"The other persons present at [the house] became aware of the violent altercation and panicked; many fled the scene. In the midst of this chaos, E.P. and the defendant were distracted, and [the victim] was able to escape out the back door. He made his way to the driveway and then collapsed.

"The defendant and E.P. left quickly thereafter. E.P. went to his mother's home in New Haven. The defendant went to Alberta Borelli's house, where his [friend], Mala Meekins, was staying. While there, the defendant made several telephone calls in which he stated that he had stabbed someone. E.P. and the defendant spoke by telephone from their respective locations after seeing local news reports of [the victim's] stabbing. The defendant was nervous because he thought he may have killed [the victim]. E.P. informed the defendant that [the victim] was alive, but in critical condition. The defendant later traveled to Michigan, where he discarded the knife.

"The defendant was arrested and charged, by way of substitute information, with three counts: assault in the first degree, unlawful restraint in the first degree and possession of a dangerous instrument." (Footnote omitted.) *State* v. *Santos*, supra, 146 Conn. App. 539–41.

A few weeks prior to trial, Donald Light, a private investigator hired by the defendant, interviewed E.P. Light noted that E.P. was held at Garner Correctional Institution (Garner), which he believed housed individ-

uals with mental health issues. Light observed that E.P. moved slowly, his speech was slow and labored, and he seemed catatonic. On the basis of Light's interview with E.P., the defendant filed a motion for an in camera review of E.P.'s psychiatric records. The court granted the motion and reviewed the records.

During trial, E.P. was called to testify by the state. He testified that he had pleaded guilty to assault in the first degree as an accessory for his role in the stabbing of the victim and was incarcerated at Garner. He further testified that on February 3, 2007, he was living at the house with some other individuals and that they frequently had visitors who came to get high on crack cocaine. He stated that he had known the victim for approximately two months and that he had no problems with the victim. E.P. stated that the victim had been at the house earlier on February 2, 2007, but returned because he thought that the defendant and his girlfriend were involved in some sort of relationship. E.P. testified that the defendant had been waiting for the victim to return, and that he told the victim and the defendant that he did not want any fighting between them.

E.P. further testified that on the day of the incident, he had seen the defendant with what looked like a miniature hunting knife that folded up. He stated that he had seen the defendant with the knife on previous occasions and that when the defendant got high, he would walk around with it in his hand. E.P. stated that when the victim arrived back at the house, he opened the door for the victim and they walked toward the kitchen. There, a fight broke out between the defendant and the victim, and E.P. testified that he saw the defendant grab the victim and start stabbing him on the arms and in the chest with the same knife that he had seen the defendant with earlier.

E.P. stated that, immediately following the stabbing, he saw the defendant put the knife in his pocket, and that the defendant left the house "right away" after the stabbing because "there was too much screaming." E.P. stated that the victim left through the back door and fell down on the patio before walking down the stairs and falling again on the driveway.

After the stabbing incident, E.P. testified that he went to his mother's house, and, after three weeks, entered a drug treatment program. E.P. testified that he had a clear memory of the incident and that he remembered seeing the stabbing. E.P. further testified that the state did not offer or promise him anything in exchange for his testimony and that his sentence for his role in the case did not take into consideration his willingness to testify. He said that he was testifying "[b]ecause of [his] own free will."

Following the direct examination of E.P., the court released four of the approximately 350 pages of E.P.'s

psychiatric records. Defense counsel then stated that she needed some time to review the disclosed pages and research the information contained therein before she could cross-examine E.P. The state agreed to take two of its witnesses out of order to accommodate this request.

Following the testimony of those two witnesses, the court suggested that it was reconsidering its decision to release the four pages of E.P.'s psychiatric records. Part of the court's concern was E.P.'s demeanor on direct examination. The court remarked that during his testimony, E.P. appeared to be "mentally sound and testified accordingly." The court then indicated that cross-examination on the disclosed records would be limited. The court also prohibited defense counsel from any further disclosure of the four pages to third persons: "In regard to the disclosure, they are for counsel only and not to be disclosed to any other person." Defense counsel requested the right to show the four disclosed pages to a social worker, whom defense counsel was considering calling as an expert witness, in order to prepare for cross-examination. The following colloquy then occurred between the court and defense counsel:

"The Court: Show it to a clinical social worker to determine what?

"[Defense Counsel]: To prepare, number one, for cross-examination, and, two . . . we may use an expert with regard to this.

"The Court: Extrinsic evidence on the disclosure, is that . . . what you're suggesting?

"[Defense Counsel]: I don't think it's extrinsic . . . evidence, Your Honor. I think it goes to—

"The Court: All right. The answer is no. Yes, any other questions?

"[Defense Counsel]: We can't show this to prepare?

"The Court: The answer is no. If there is a need to change that decision, I will, but, now, the answer is no."

Defense counsel then began her cross-examination of E.P. When she reached the point where she would be questioning him on the material in the disclosed psychiatric records, the court adjourned for the day.

The next morning, defense counsel requested that the court order the state to get an authorization from E.P. to release the records to an expert. Defense counsel argued that in order to present an effective defense for her client, she needed a mental health expert to help her understand the meaning of the material contained in the four disclosed pages.

After argument by both sides as to why defense counsel needed to consult an expert about the material contained in the four disclosed pages, the court reiterated its uncertainty regarding the propriety of its decision

to release the records. The court stated, "I'm debating . . . to even vacate that order and return [the four disclosed pages] to me and put them under seal so the Appellate Court can look at them." The court then repeated its prohibition on consulting an expert: "Your motion for [a] continuance is denied. Your motion to get an expert is denied. . . . The request for . . . time to hire an expert to review the records is denied."

After further discussion, defense counsel stated again her need to consult an expert and she moved to strike E.P.'s testimony. The court then asked defense counsel on what basis she was asking the court to strike the testimony. She responded that she needed to disclose the records to an expert for consultation and preparation for cross-examination because she was not familiar with the medications and codes contained in the documents. The court denied defense counsel's motion to strike.

Defense counsel then made an offer of proof as to the questions she intended to ask E.P. on cross-examination. The court limited the extent of cross-examination and some of the questions that defense counsel proposed to ask were not allowed. Specifically, the court ruled that defense counsel could not ask "if [E.P.] suffers from any hallucinations, delusions or hearing voices . . . or [whether he has] any problems with memory or thought processing as a result of these disorders . . . ." She was not allowed to ask whether "his not taking [medication] had an [e]ffect on his perception, ability to recall, etcetera" or whether "on that day he ha[d] . . . any problems perceiving or recollecting things because he wasn't on medication . . . ." The court also told defense counsel that she was allowed to ask E.P. if he was hearing voices on the day of the stabbing but "if he says no, that's it, you're bound, that's it." Beyond that, all questions defense counsel wanted to ask were approved by the trial court.[3]

Defense counsel then began her cross-examination of E.P. E.P. testified that at the time of his testimony he suffered from schizoaffective and bipolar disorders and that he was taking four medications (Lithium, Ativan, Abilify, and Trazodone) for those disorders at that time. He testified that those medications did not affect his ability to perceive or see things, and did not affect his memory or recall. E.P. further testified that on February 3, 2007, the day of the stabbing incident, he did not suffer from the disorders and that he did not have the symptoms associated with the disorders. He also testified that he was not taking medication or hearing voices on that day, and he was not hearing voices at the time of his testimony.

The defendant claims that his rights to confrontation and to present a defense under the sixth amendment to the United States constitution were violated when the trial court disclosed only four pages of E.P.'s psychiatric

records and prohibited him from consulting with an expert witness or calling one to testify as to the four disclosed pages. Although the certified question only specifically mentions the confrontation clause, the right to present a defense has roots in the confrontation clause and is applicable to the states through the due process clause of the fourteenth amendment; *State* v. *Andrews*, 313 Conn. 266, 272 n.3, 96 A.3d 1199 (2014); both of these additional claims, therefore, are relevant to this appeal. Assuming, without deciding, however, that we agree with the defendant's claims that his constitutional rights were violated, we conclude that any error was harmless beyond a reasonable doubt.[4]

"We first set forth the standard of review for determining whether the exclusion of . . . evidence entitles the defendant to a new trial. Upon review of a trial court's decision, we will set aside an evidentiary ruling only when there has been a clear abuse of discretion. . . . The trial court has wide discretion in determining the relevancy of evidence and the scope of cross-examination and [e]very reasonable presumption should be made in favor of the correctness of the court's ruling in determining whether there has been an abuse of discretion. . . . To establish an abuse of discretion, [the defendant] must show that the restrictions imposed upon [the] cross-examination were clearly prejudicial." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler*, 271 Conn. 338, 378–79, 857 A.2d 808 (2004), cert. denied, 546 U.S. 845, 126 S. Ct. 4, 163 L. Ed. 2d 110 (2005). With respect to the disclosure of privileged records, "[o]n appeal, the appellate tribunal reviews the confidential records to determine whether the trial court abused its discretion in concluding that no information contained therein is especially probative of the victim's ability to know and correctly relate the truth so as to justify breaching their confidentiality in disclosing them to the defendant." (Internal quotation marks omitted.) *State* v. *Delgado*, 261 Conn. 708, 719, 805 A.2d 705 (2002).

"If, after reviewing the trial court's evidentiary rulings, we conclude that the trial court properly excluded the proffered evidence, then the defendant's constitutional claims necessarily fail. . . . If, however, we conclude that the trial court improperly excluded certain evidence, we will proceed to analyze [w]hether [the] limitations on impeachment . . . [were] so severe as to violate [the defendant's rights under] the confrontation clause of the sixth amendment . . . . Our standard of review for this constitutional inquiry is de novo." (Citation omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Annulli*, 309 Conn. 482, 491–92, 71 A.3d 530 (2013).

"It is well established that [a] criminal defendant has a constitutional right to cross-examine the state's witnesses, which may include impeaching or discrediting

them by attempting to reveal to the jury the witnesses' biases, prejudices or ulterior motives, or facts bearing on the witnesses' reliability, credibility, or sense of perception. . . . Thus, in some instances, otherwise privileged records, like the ones in this case, must give way to a criminal defendant's constitutional right to reveal to the jury facts about a witness' mental condition that may reasonably affect that witness' credibility. . . .

"We are mindful, however, that the right to confront and to cross-examine is not absolute and may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process. . . . The need to balance a witness' statutory privilege to keep psychiatric records confidential against a defendant's rights under the confrontation clause is well recognized." (Citations omitted; internal quotation marks omitted.) *State* v. *Peeler*, supra, 271 Conn. 379–80.

"It is [also] well established that [t]he federal constitution require[s] that criminal defendants be afforded a meaningful opportunity to present a complete defense." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 313 Conn. 275. "A defendant's right to present a defense is rooted in the compulsory process and confrontation clauses of the sixth amendment . . . [to the United States constitution, which] are made applicable to state prosecutions through the due process clause of the fourteenth amendment. *Pointer* v. *Texas*, 380 U.S. 400, 403, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (right to confrontation); see *Washington* v. *Texas*, 388 U.S. 14, 18, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (1967) (right to compulsory process)." (Internal quotation marks omitted.) *State* v. *Andrews*, supra, 272 n.3.

Assuming, without deciding, that the trial court violated the defendant's rights to confrontation, due process, and to present a defense, we next consider whether the error was harmless beyond a reasonable doubt. "If the claim is of constitutional magnitude, the state has the burden of proving the constitutional error was harmless beyond a reasonable doubt." (Internal quotation marks omitted.) *State* v. *Peeler*, supra, 271 Conn. 384. "Whether a constitutional violation is harmless in a particular case depends upon the totality of the evidence presented at trial. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless. . . . Whether such error is harmless in a particular case depends upon a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the evidence on the trier of fact and the result

of the trial. . . . In order to assess the harmfulness of the impropriety, we review the record to determine whether there is a reasonable possibility that the evidence . . . complained of might have contributed to the conviction . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Madigosky*, 291 Conn. 28, 45–46, 966 A.2d 730 (2009).

We conclude that the state has proved that any error the trial court committed in releasing only four pages of E.P.'s psychiatric records and in limiting the defendant's ability to consult with an expert as to the disclosed pages was harmless beyond a reasonable doubt. The state presented a strong case and, even without E.P.'s testimony, there was sufficient evidence for the jury to convict the defendant, including sufficient evidence of intent to overcome the defendant's intoxication defense.[5]

First, there were several witnesses whose testimony corroborated that of E.P. and on which the jury could have relied in convicting the defendant. The victim testified that he was walking home from a friend's when the defendant and E.P. called out to him from the porch of the house. The victim said that the defendant repeatedly accused him of trying to set up the defendant, but the victim testified that he did not know what the defendant meant by this accusation. The victim then testified that it was the defendant who stabbed him. During the fight, the defendant ordered E.P. to force the victim into the basement so they could further harm him.

Frederick Elbert, a friend of E.P.'s who had just been released from jail on February 2, 2007, and who had come to visit him at the house, testified that he heard the defendant, on that same day, threaten the victim for beating up the victim's girlfriend at the house, saying, "if [you disrespect] my boy['s] house, I'm going to fuck you up." Elbert further testified that he saw the defendant with a knife in his hand and saw him stab the victim with it.

Jolie Shelton, a visitor to the house, testified that the defendant did not want the victim at the house because the victim and his girlfriend were always arguing. She told police that, on the evening of February 2, the defendant said that he could not wait until the victim came back. Shelton also testified that she had seen the defendant with the knife sometime in the early morning hours of February 3, 2007. When the victim returned to the house on February 3, 2007, she heard the victim and the defendant arguing and scuffling and that, for part of the fight, she could see them from the living room. As the fight was occurring, she tried to leave, but by the time she reached the kitchen, the victim was gone and only the defendant remained. In the kitchen, she saw many broken items and she saw blood along the back of the room toward the back door. She then left

the house and found the victim lying in the driveway and called 911.

Meekins, the defendant's friend, testified that early in the morning of February 3, 2007, the defendant called her to say he had done "something bad" and needed somewhere to go. She told him to come to Borelli's house, where she was staying, and, after he arrived, she heard him speaking on the telephone to five or six different people, saying he stabbed someone. When he arrived at Borelli's house, she also noticed that his white sneakers had little red spots on them. Meekins testified that the day after the stabbing, she saw the defendant with a knife in his hand.

The defendant's own testimony and letters he wrote from prison provided further support for the jury's verdict. The defendant testified that he and the victim had had an argument during the day of February 2, 2007, leading the victim to get upset and leave the house. When the victim returned later that night, they started arguing again and a fight broke out. The defendant admitted that he had been smoking crack cocaine and drinking alcohol for a few days prior to the stabbing, including throughout the day of February 2 and into February 3, 2007. He testified that, by the time of the fight, he was "[t]ired, exhausted, paranoid, cracked out" and that "[w]hen you're under the influence of crack, you don't have control of yourself . . . ."

During the course of the fight, the defendant noticed that the victim was bleeding. The defendant testified that he did not remember stabbing the victim, but because he was high, he could not remember the details of the fight. He did, however, remember engaging in a fistfight with the victim, trying to avoid getting hit and trying to "get [his] blows off." The defendant testified that his intention was to beat up the victim by punching him more times than he was punched. On cross-examination, the defendant stated that when he is in a fight, he is defending his life, he is trying to win, and he will not stop until he thinks he has defeated his opponent. The defendant testified that he always carried a knife for protection because he had previously been attacked. He could not remember, however, whether he had his knife with him during the fight with the victim, but admitted that he usually carried it.

In addition to his testimony, the defendant admitted writing some letters to friends about the events surrounding the stabbing, which provided additional support for the jury's verdict. Those letters were read into evidence by Daniel Goyzueta, a correctional officer who monitors the prison mail and who intercepted the letters when the defendant mailed them. The first letter was written by the defendant on June 28, 2007, and indicated that the defendant learned that E.P. was "snitching on" him and, because of that, the defendant had attacked E.P. when they were in prison together. The defendant

also wrote in the letter that, "[Borelli] is . . . the one who gave me up . . . . It's all up to [the victim] and [Borelli], if they go in, I stay in, just that simple . . . ." The defendant wrote a second letter on February 21, 2008, in which he relayed to a friend, "I was lost in my own world, I didn't control my actions . . . just say that you know the real [me], not the one under the influence of drugs. I let everything from me, now I must pay with time . . . . I was doing good and [messed] up, there's nobody to blame." The final letter was intercepted on June 26, 2008. In that letter the defendant wrote, "[t]hings are looking real good, they are blaming some other guy in my same case, so, that tells me that they don't have nothing on me. [I have been told] that the victim's not going to go to court . . . ."

In addition to testimony corroborating E.P.'s account of the incident, and the defendant's testimony which further supported the jury's verdict, the defendant was able to cross-examine E.P. to some extent about his mental health and to impeach his testimony in other areas. The defendant was able to put before the jury that E.P. had schizoaffective and bipolar disorders and that, at the time of his testimony, he was taking four different medications for those disorders. E.P. also testified on cross-examination that he did not take any medications on the date of the stabbing. From this information, the jury could have inferred that E.P.'s ability to perceive, see, or remember was affected. Additionally, the defendant was able to ask E.P. if he was hearing voices at the time of his testimony or if he heard them on the day of the stabbing

The defendant was further able to attack the credibility of E.P. as to other aspects of his testimony. He was able to elicit information about E.P.'s conviction for his role in this stabbing, as well as his significant prior criminal history. E.P. admitted on cross-examination that he was testifying in this case because he expected to have his sentence lowered for his role in the stabbing. The defendant was able to cross-examine E.P. on his history of substance abuse and question the credibility of his testimony because he had been high on crack cocaine during the stabbing incident.

The defendant also impeached E.P. about his relationship with the victim, as E.P. had testified that he and the victim had a good relationship but, on cross-examination, admitted that he thought the victim told the police that he had participated in this crime because the victim thought E.P. was having a relationship with his girlfriend. Additionally, the defendant was able to impeach E.P. about inconsistent statements he made about whether he had witnessed the stabbing. In his statements to police, E.P. said he did not see the stabbing but he testified at trial that he did. The following colloquy occurred during the defendant's cross-examination of E.P.:

"Q. . . . [I]n the . . . statement that you gave on March 19, 2007, you specifically told the police, didn't you, that you did not actually see the stabbing, is that correct?

"A. Correct.

"Q. In fact, you said I didn't seen the stabbing or nothing, right?

"A. Correct.

"Q. And that is a completely different story than what you're telling this jury today? . . . And, you lied to police, in essence?

"A. I didn't be totally honest with them.

"Q. Well, sir, would you . . . describe it as not being totally honest to say you didn't see something at all and, then, tell the jury that you stood there and saw the whole thing? That's . . . completely dishonest, isn't it?

"A. Yeah.

"Q. And, so, you lied to the police to help yourself, that's right, isn't it?

"A. No, I told them the truth.

\* \* \*

"Q. What I'm asking you, sir, is on the day you gave your statement to police, you told them that you didn't see the stabbing, you would agree with me on that, correct?

"A. Correct.

"Q. And that was a lie, wasn't it?

"A. Mis-telling the truth.

"Q. You just don't want to say it's a lie, do you? You have trouble with that? . . . It wasn't true, was it, sir?

"A. No.

"Q. Okay. And that wasn't the only thing that you lied about, correct?

"A. Not telling the complete truth about it."

In light of the foregoing, the jury had ample evidence from which to evaluate E.P.'s testimony in reaching its verdict. Accordingly, we conclude that any error the trial court committed in releasing only four pages of E.P.'s psychiatric records and in limiting the defendant's ability to consult with an expert as to the disclosed pages was harmless beyond a reasonable doubt.

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

[1] The defendant also has alleged violations of state constitutional rights, but he has failed to provide an independent analysis of them as required by *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992). "We have repeatedly apprised litigants that we will not entertain a state constitutional claim unless the defendant has provided an independent analysis under the

particular provisions of the state constitution at issue. . . . Without a separately briefed and analyzed state constitutional claim, we deem abandoned the defendant's claim. . . . Accordingly, we analyze the defendant's due process claim under the federal constitution only." (Citation omitted; internal quotation marks omitted.) *Barros* v. *Barros*, 309 Conn. 499, 507 n.9, 72 A.3d 367 (2013).

[2] We refer to this witness by his initials because we discuss his privileged psychiatric records.

[3] We observe that the defendant does not claim in this appeal that the trial court's limitation on cross-examination was improper. The defendant relies on those limitations only to support his claim that the alleged error was not harmless.

[4] Although we do not decide whether the trial court violated the defendant's constitutional rights, we see no justification in law or in fact why a court would not allow a party to consult with an expert witness. This is especially true when the party wishes to consult on medical records.

[5] The defendant contends that only E.P.'s testimony provided the necessary intent by which the jury could have convicted the defendant and that the defendant's intoxication as a result of being high on crack cocaine prevented him from forming the specific intent necessary to commit assault in the first degree and unlawful restraint in the first degree.